63 N.J. Super. 16 (1960)
163 A.2d 593
STATE OF NEW JERSEY, PLAINTIFF,
v.
SYLVESTER JOHNSON, STANLEY CASSIDY AND WAYNE GODFREY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 7, 1960.
*18 Mr. Norman Heine, Prosecutor of Camden County, attorney for the State.
Mr. Edward Kent, attorney for defendants.
MARTINO, J.C.C. (temporarily assigned).
Defendants were convicted of murder in the first degree without recommendation. The death penalty was imposed. Pursuant to R.R. 3:7-11 an application was made for a new trial on the basis of newly discovered evidence. The application was made on affidavits and argument and was rejected. An appeal was taken to the New Jersey Supreme Court which by order dated May 2, 1960, ordered the trial court to proceed to take testimony on such grounds as the defendants specified. A hearing was held on May 23 and 24, 1960.
Before relating the evidence produced at the recent hearing a sketchy background might assist in understanding the plight of these three defendants.
The State contended and undoubtedly proved that on Friday evening, January 24, 1958, Edward J. Davis, who owned and operated a toy shop at 1731 Broadway, Camden, New Jersey, was fatally wounded and died 35 minutes after entering the hospital. The medical examiners concluded that *19 Davis had been shot four times. There were no powder burns on his body and as a result of a clue furnished by a witness who observed an automobile going through a red traffic light, which automobile was registered in the name of one of the defendants, the three defendants were apprehended. Each of them confessed to their participation in the attempted robbery and murder. Their confessions showed that the three defendants had previously secured guns, had arranged to rob the victim and that pursuant to their plan defendant Godfrey drove his automobile with the two other defendants as passengers to the vicinity of the Davis store. The State proved through the confessions that the defendant Cassidy, with a gun which he had borrowed from a friend, and defendant Johnson, with a revolver which was given to him by the defendant Godfrey, entered the store. Defendant Johnson confessed that he said to the decedent Davis, "This is a stickup." The confessions indicate that immediately after the shooting the defendants Cassidy and Johnson escaped through a rear door and both defendants later entered the defendant Godfrey's automobile after which they returned to their respective homes.
The principal witness for the State was one Noah Hamilton, who testified that six or eight weeks before the fatal shooting he had a conversation with the defendant Godfrey who asked him if he wanted to make some money and suggested a holdup of the toy store of the decedent. On the day following the alleged offense the State's witness, Noah Hamilton, an admitted friend of the three defendants, whose testimony also figures in this rehearing application, went with the three defendants to Newark.
The defendants did not take the stand in their own behalf.
Of particular significance to this background is the absence of any inference from any of the statements made by each of the defendants before the initial trial that the decedent Davis was in any business other than the legitimate business of selling toys.
*20 A condensation of the testimony submitted on this application for a new trial and which contains the salient evidence introduced by the defendants to justify their present application follows.

DEFENDANTS' CASE.

Sylvester Johnson
One of the defendants. He testified he requested of his attorney the privilege of taking the stand to testify but his attorney refused. His mother likewise asked for permission to testify and she was refused. He testified that he told his attorney that he was involved in narcotics but this evidence was not introduced at trial although he requested his attorney to make that fact known. He stated that he knew the decedent prior to the date of the fatal shooting. He stated that one Noah Hamilton owed him some money in the amount of $15 for narcotics which this defendant had delivered for Hamilton and decedent Davis, and that he was supposed to collect for this delivery from Hamilton but Hamilton said the money was due him from the decedent. He stated that he first met with the decedent through Hamilton in November of 1957, which was three months before the alleged murder, and the meeting came about as a result of the purchasing of narcotics from Hamilton; and on one occasion Hamilton suggested that since he was out of work that this defendant could make money by delivering packages for him and Mr. Davis, and as a result Hamilton took him to the decedent's store. While in the store Hamilton and decedent had a conversation not in his presence, and after the conversation was completed he heard Hamilton tell the decedent that he was the fellow who was going to deliver packages for Mr. Davis, whereupon Mr. Davis approved and advised him that Hamilton would take care of the defendant. He then went on to say that he and Hamilton made deliveries as agreed and that on each occasion a "delivery" was made, Hamilton paid him. He stated that before *21 the shooting took place that he had been a user of narcotics such as marijuana, nembutol and a drug known as "benneys." He says that on the day of the shooting he had awakened and went to an employment office, after which he started for Hamilton's home and he asked Hamilton for payment for a delivery he had made the day before. Hamilton denied that he had any money for him and said that the defendant should go see the decedent Davis and get it. He says he argued with Hamilton because he felt Hamilton was "beating him" out of the money, but Hamilton told him that the decedent would straighten him out, whereupon he asked for and received three reefers and three nembutol tablets and returned to his home where he played records and smoked the reefers and took the pills. Later on he went to the defendant Cassidy's home because he wanted him to accompany him to Davis'. He stated that when he left his home he was "good and high" and he was still smoking marijuana, and as he got to Cassidy's home the defendant Godfrey was pulling up in his automobile. He stated that he went into Cassidy's home with Godfrey, and although he was pretty high at the time and "can't remember exactly what I done after I got in the house," he did deny that a robbery was planned. He stated he did not remember any discussion that was had between him and the other defendants at the time they went into Cassidy's home, and the next thing he remembers is the following morning when he found himself in his sister's home with a hangover. He remembers nothing from the time he got into the car with the other two defendants until he awoke the following morning. He stated that his sister on that occasion questioned him about an injured hand and he told her he did not know what happened but thought "maybe I had been in a fight or something." Later he went to Bill's Bar and was there about 15 minutes when the defendants Godfrey and Cassidy and a witness Noah Hamilton pulled up in an automobile. The two defendants asked him if he recalled what he had done the night before and he said he did not, whereupon they told him what had *22 happened. Subsequently this defendant was arrested in Newark where he was interrogated by three Camden detectives at which time he admitted that "Well, I know of the murder but there was no robbery." He testified that he told them he did not commit a robbery. He told them exactly what had happened.
On cross-examination he admitted that he had the opportunity to go over copies of his confession and did not call to his attorney's attention any fact stated therein that was not true, but insisted that he explained to his attorney that anything relating to armed robbery was not true. There followed a series of questions in which reference was made to the confession given by this defendant, but he repeatedly said that he did not remember any of the questions and his answers. He recalls being apprehended four or five days after the alleged murder. This witness testified that he told the authorities on being questioned that he was using narcotics at the time and that he knew nothing about armed robbery, and he explained that he was working for Noah Hamilton and the decedent and that everything that was contained in his confession was fed to him by a city detective; and although many of the questions asked therein might have been asked of him, he did not recall the statement and whatever statement was made, the contents were fed to him by the city detective. He admitted that he told this same detective that he knew nothing about armed robbery, but he did know about the murder and this knowledge was brought about by information given to him by the other two defendants. He stated that Cassidy, with whom he had entered the decedent's store, related to him what had occurred while they were in the store before the fatal shooting and that Cassidy told him that when he asked Davis (decedent) for money for delivering the package that Davis said Noah Hamilton had the money and that he and Davis had an argument and that Davis threw him out of the store the first time, but he does not remember entering the store and that his return to the store was related to *23 him by Cassidy. He admitted that he had never approached Davis for money before and only went to the store because Hamilton told him to see Davis. He further stated that he told his attorney when he first interviewed him that he had gone to the decedent's store for money due him. He stated that his attorney said if he insisted on taking the stand that he wouldn't represent him anymore and that this defendant insisted on taking the stand because he felt that this was the only way to be saved from the death penalty, but that his attorney said he would not take the responsibility of suggesting that procedure and that he asked this defendant to sign a paper which has been introduced in evidence (S-1). This defendant says that he was under the impression that he was going to testify until his attorney stood up and said "No Defense." He said that both Cassidy and Godfrey wanted to take the stand. It is significant that this defendant says that he met the decedent in November 1957 by an introduction of Noah Hamilton, which meeting took place in the decedent's store (this is denied by Hamilton). This defendant stated on cross-examination that defendant Cassidy knew he was "delivering" narcotics for Hamilton. Significantly, this witness recalls being "high" while going to Cassidy's but does not recall entering the decedent's store. The substance of this defendant's testimony then reduces itself to the principal contention that the defendant Sylvester Johnson was so "high" that he recalls nothing which transpired within the store yet his goal was to collect money due him from the decedent at the store and that since he was a user of narcotics this fact should have been brought to the attention of the jury and that he had insisted on this right but was refused the opportunity by his counsel and that whatever confession he made concerning the alleged murder was a concoction of the detectives who fed him the material; that any statement he made was involuntary and that decedent was a peddler of narcotics and this was known to the defendant Johnson for some period previous to the fatal *24 incident. This defendant admitted that he had been convicted of the crime of breaking and entering. Defendant Johnson when asked whether or not he would have any objection as to his trial attorney's testifying in this matter expressed a dislike for the attorney's opportunity to testify and the reason he gave was, "I don't think Mr. Bertman would try to help me at all and I do not think he has my best interest at heart and I think he would only hurt me by only helping hisself."

Alice Conroy
This person identified herself as Juror No. 13 and she was asked whether or not the jurors had discussed the case while they were staying at the hotel following the close of each court day. She stated categorically that the court had cautioned the jury not to discuss the case and as a result the case was not discussed and that at no time prior to the charge of the court did she hear anyone discuss the case as members of the jury.

Grace M. Wheeler
One of the jurors who was asked on the voir dire whether or not she or anyone of her friends or relatives had ever been a victim of a robbery at which time she answered, "No I have not, no one that I know of." She was asked whether or not at this time she desired to change that answer and she stated that, "At that time I told the truth. I did not remember. I hadn't any reason to remember. In fact, the truth is this, that if I had known it, believe me, I would have told it if it had been any way of getting out of being on the jury." It appeared that her husband had been the victim of an armed robbery. In fact there was some reference to more than one armed robbery and this occurred 18 or 19 years before the date of the voir dire and she had completely forgotten it and it was brought to her attention approximately six months after the trial had been concluded. However, the trial record indicates that Mrs. *25 Wheeler was not one of the jurors who was finally selected since she was excused because of illness before the jury began its deliberation. She further stated that at no time before her withdrawal from the jury did she ever discuss her husband's situation with any member of the jury and that at no time from the commencement of trial up to the Judge's charge did she hear any jurors discussing the case.

Thomas G. Wheeler
The husband of the juror and previous witness, Grace M. Wheeler, related that in 1941-42 he was involved in three armed robberies at which time he was working for the Atlantic Refining Company and at the time of these robberies he was married to the juror. He admitted that he had discussed these robberies with her "at the time of the robberies." He stated that there had been a discussion concerning his experiences after the murder trial had been concluded.

Barbara Molock
This witness was called to corroborate that on the day of the shooting she had been with Stanley Cassidy and in the afternoon she saw the defendant Johnson with the defendant Godfrey and that Johnson had an unusual attitude in that he did not respond to questions she asked him; that although he usually joked with her this day he did not and his eyes were "sleepy," and although an effort was made through this witness to establish the fact that Johnson was under the influence of narcotics she admitted that she had never observed anyone under that influence.

Geraldine Hatcher
This is a sister of the defendant Sylvester Johnson. It was at her home that Johnson stated that he found himself the morning following the alleged shooting. She testified that he had an improvised tourniquet on his hand and that he looked funny, confused  his eyes red and pupils dilated. She stated that she was a graduate nurse and at the end of this *26 year she will be registered and that she is presently employed at the Albert Einstein Medical Center. She outlined her three years of training and was asked whether or not she had ever had occasion to observe people under the influence of narcotics and although she never saw anyone under the influence of marijuana, she did see persons under the influence of nembutol. She described her brother's features and explained that he appeared to be in a confused state and when he was asked how he hurt his hand he said he didn't know and this upset her. When she was asked on cross-examination to describe whether or not dilated pupils refer to large or small, she said "small," but was unable to express a word which meant enlarged pupils.

Allain Johnson
The mother of the defendant Sylvester Johnson. She started to relate that her son's lips and mouth were swollen when she saw her son after he had been picked up and brought to Camden from Newark. This testimony was apparently unexpected by defense counsel and he did not press this line of testimony. She stated that she had asked her son's attorney for the right to testify in his behalf and that his attorney advised her that he did not want to make a fool of himself and since the other two defendants were not taking the stand he was not going to put her son on the stand. She insisted that she told the attorney that her son wanted to take the stand and that he had a right to take the stand since his life was at stake. She claims that she was presented with a statement by the attorney for her signature, which statement has been marked in evidence and which statement she refused to execute. She claims that she never knew that her son took narcotics prior to the time of the alleged shooting. She does know that her son told his attorney that he took narcotics because her son told her he gave this information to the attorney. She also said that what her son told his attorney was written down and that her son was assured that this evidence would be used.
*27 On cross-examination she insisted that her son's attorney promised her that her son would never go to the chair; that the selection of her son's attorney was through the recommendation of her many friends in that, "Mr. Bertman was a capable lawyer and I decided on him." There followed much discussion during cross-examination as to the contents of the document executed by her son which is a part of the evidence and it was very difficult to ascertain anything of a definite nature from the mother's testimony concerning this statement. She did admit that following the conviction she asked Mr. Bertman to handle the appeal.

Vernie E. Jones
A girl friend of defendant Johnson who dated him frequently. She acknowledged having seen the defendant Johnson after he had used marijuana. This witness denied seeing the defendant Johnson on the day of the crime.

Noah Hamilton
This witness is an admitted dope peddler and user and a close friend of each of the defendants. It appears that one of the defendants, Sylvester Johnson, was indebted to him for drugs and about eight months before the fatal shooting Johnson, together with Godfrey, called at this witness' home for drugs but was refused because Johnson allegedly owed Hamilton some money for drugs purchased earlier. On this occasion Johnson turned to Godfrey and said, "Let's go" and Johnson said he had another connection to purchase drugs and when he (Hamilton) attempted to ascertain from Johnson who that person was, Johnson did not respond but Godfrey did mention the name of the decedent Davis, a fellow who sold toys on Broadway. This alleged conversation took place approximately eight months before the fatal shooting. This witness although very friendly with these defendants was one of the State's principal witnesses at the original trial and his testimony played a big part in the State's case. Although at the original trial *28 no mention was made of the use of narcotics by Sylvester Johnson, at this hearing he testified that he had sold narcotics to Johnson in the past. Although this witness had been cross-examined at the original trial by counsel, at no time during the initial trial was any mention or any reference to the decedent as a dope peddler made or the fact that defendant Johnson was a user. Although at the beginning this witness testified that Godfrey told him that the decedent Davis was a seller of narcotics, later on while still under direct questioning by defense counsel he said that Johnson and one Pat DiCarlo told him that Davis was a seller. It should be noted here that the record indicates that Pat or Patsy DiCarlo was in court during the hearing but was not called to corroborate the fact that the decedent Davis was a seller of narcotics. Hamilton, who admitted using and selling dope, conceded at least four criminal convictions and at the time of this hearing was confined to the county jail on a charge of breaking and entering. This witness called by the defendants denied that Johnson ever came to him prior to the shooting and sought money for services rendered. He gave a lie to the Johnson story that he, Hamilton, had introduced the defendant Johnson to the decedent Davis and denied that Johnson sought him on the morning of the shooting. For the first time this witness made reference to the fact that the defendant Godfrey also used narcotics although at the initial trial no such fact was developed. Although Johnson in his testimony said that Hamilton owed him money, Hamilton said that the reverse was true  that Johnson owed him money for the purchase of drugs made four or five days before the shooting. This witness also stated for the first time that Cassidy also had purchased drugs about a week or two before the shooting. So it appears for the first time that this witness links all defendants with the use of marijuana although an extensive direct and cross-examination of the witness did not develop one iota of evidence bearing on this fact at the initial trial. This witness, in contradiction to the defendant Johnson's *29 testimony, stated that he did not work for the decedent Davis and had been in decedent's toy store only on one occasion with defendant Godfrey at which time Godfrey wanted to buy a toy for his child.
Hamilton at no time was reluctant to expose himself to a nefarious trade or business and therefore it is proper to assume that there would have been no reluctance on his part to confirm decedent's business if it were as distasteful as these defendants want this court to believe.

Robert A. Jones
This witness was brought to this hearing from the New Jersey State Prison where he is confined and he was permitted to testify that while he was confined to the county jail he had a conversation with the defendant Stanley Cassidy and that Cassidy told him at that time he was an addict and although this line of testimony was in the nature of hearsay this witness was permitted to testify that defendant Cassidy told him that Davis was a dealer in drugs. There developed a new version of background history to connect the decedent Davis with the sale of drugs. This witness stated that Cassidy told him he was indebted to decedent Davis for drugs and that the decedent Davis would give him no more drugs until Cassidy "would come up with some money." This story appeared to be so incredulous that the Court pressed the witness to ascertain whether or not he was certain about whom he was speaking and this witness identified the defendant Cassidy in the courtroom.
It is interesting to note at this point that defendant Cassidy who testified at this hearing denied being personally acquainted with the decedent Davis.

Arthur Cole
This is another prisoner from the State Prison who apparently attempted to give the impression from his testimony that he had delivered packages for decedent Davis and that he met Mr. Davis on an occasion when he entered the *30 store to purchase toys and although he does not directly accuse the decedent Davis with the sale of drugs, his purpose as a witness was to leave that impression. Although he was not direct in his testimony you could infer that he was attempting to create the inference that the decedent Davis had used him on occasion to deliver packages which might be packages of drugs but the conditions under which these deliveries were made were so ridiculous that his testimony lacked credence. He admitted that he did not know what was in the packages.

Ernest Rodgers
This witness admitted he was a dope user and a convicted criminal and once was confined to the New Jersey State Mental Hospital and a lifelong friend of the family of one of the defendants. His testimony proved to be disjointed and inconsistent and contradictory. By this witness it was attempted to establish that the decedent Davis was a seller of narcotics. Although this witness never made any purchases from the decedent he attempted to create the impression that friends of his who were users had made such purchases since they had dope in their possession after they had entered the decedent's store and returned to his presence. He attempted to leave the impression that he was living in a home in close proximity of the decedent's store during the time the decedent lived but on cross-examination it developed that he moved to this address about three weeks before the date set for the present hearing. A careful analysis of all his testimony indicates so many inconsistencies and contradictions that it would be difficult to place any credence in anything he said under oath.

Wayne Godfrey
This defendant admitted that he had borrowed a gun from one James Walker the night before the fatal shooting and he said that he borrowed this gun to carry for protection because he owed a shylock named Roosevelt some money *31 which he had borrowed. However, he stated later he paid the shylock the money he owed him and returned to Camden without any reference to the necessity for the use of the "protection" which he carried in his pocket. He stated that when he called to pay the shylock he had Cassidy with him and later he gave the gun to Cassidy to hold. He claims that Cassidy requested that he take the defendant Johnson to decedent's premises since Johnson wanted to collect some money from Davis that was owed to Johnson. This defendant stated that the three of them were smoking and that defendant Johnson appeared "high" and they even "smoked" on their way to the decedent's place of business. He testified that when Johnson and Cassidy left the automobile they stated that they were going to secure from Davis money that he owed them. He denied ever knowing the decedent Davis prior to the night of the shooting and further denied that he had ever been in the store although his friend Hamilton who testified stated that Godfrey had been in the decedent's store to purchase a toy previously. This witness testified that when he was arrested he was with Hamilton. He admitted his friendliness to Hamilton and admitted that they were "buddies" and used heroin and marijuana together. His only reference to decedent Davis' status as a dope seller was that Hamilton was getting it from Davis. This defendant had been previously convicted of armed robbery. It is very significant that this defendant stated in his direct testimony that his attorney advised him not to take the stand and he took this advice and he also stated that he never told the attorney that he took narcotics. He also charged that the detectives "were not interested in what actually happened but were only concerned about the robbery." He states now that he never admitted to robbery although this is a clear contradiction of his confession. Although he admits that he never told his attorney that he used narcotics, he now says he mentioned narcotics to the police. He states that defendant Johnson who was the trigger man never did know what happened on the night of the shooting until *32 defendants Godfrey and Cassidy told him. He denied that he ever went to the decedent's store for the purpose of robbery and he confirms the story of the other defendants that they called upon decedent Davis for money which was owed to defendant Johnson. He also denied that he ever stated to his buddy Hamilton that he ever went to the place for the purpose of robbing.
On cross-examination defendant Godfrey denied that he ever offered to plead guilty to murder and kept insisting that his attorney advised him he had nothing to worry about concerning the electric chair. He admitted later that he knew there had been some attempts to get the State to accept the plea of guilty of murder so that the worst they could get in punishment for the crime was a life sentence. Defendant Godfrey, of course, denied the contents of his confession and when he was referred to the confession and its contents on cross-examination he attempted to create the impression that he had been using narcotics and had been bruised and hit and, therefore, was not clear of mind. Later on when references were made to portions of his confession, most of his replies were, "I don't remember." He admits receiving a gun from a person named Walker which gun was fully loaded. The same gun was returned later to the person who loaned it. The defendant brought in the name of Patsy DiCarlo as the person who told him that the decedent Davis was a seller of narcotics and his only knowledge of the decedent's narcotic dealings was through Hamilton and DiCarlo. He denied the Hamilton story that he had ever been in the decedent's store and admitted that he had never gotten any drugs from decedent Davis.

Dolores Godfrey
Wife of the defendant Godfrey. She testified that her husband used marijuana cigarettes and had on occasions noticed the odor of marijuana within their home and found such cigarettes in his pockets which she threw away.

*33 Stanley Cassidy

He stated that on the morning of the day that the shooting occurred he went with defendant Godfrey to the docks for the purpose of securing a job and although defendant Godfrey secured a job he didn't and Godfrey took him home. He states that Godfrey asked him to hold a pistol which he did. He gave a lie to Godfrey's story about the reason for Godfrey's carrying the pistol in that he, Cassidy, stated he did not know why he, Godfrey, was carrying it. He stated that he went with defendant Johnson to make a delivery of a package which Hamilton had given Johnson, which delivery was made to an individual at Broadway and Cooper. Later he met with defendants Godfrey and Johnson and he gave Godfrey the gun he was holding which Godfrey put in his pocket. He admitted that he also had a gun but did not take it with him when he left the house and that the only gun in their possession that he knew of was in Godfrey's possession. This defendant denies that he had a gun when they entered the store and upon entering the store defendant Johnson and decedent Davis started to talk while he was looking around at the toys and then he heard decedent Davis order Johnson out of the store. Both he and Johnson left the store but after they were on the outside Johnson said he was going back to get his money and this defendant attempted to persuade Johnson not to do so but they reentered the store and decedent Davis began to use profanity. He stated that he had never seen decedent before this day and described him as a pretty heavy man. He said that he heard the argument and then saw tussling after which he heard a shot and then another shot whereupon Johnson went into the back of the store and ran out a backdoor. Later he saw Johnson standing on a corner in a dazed appearance with a gun in his hand and he grabbed him and pulled him into the automobile. The next day he and Godfrey located Johnson who denied any knowledge of what had occurred on the night previous and they explained to *34 him the situation and he felt that they were joking and did not believe their story. This defendant has no criminal record. He states that he told his attorney that he was a narcotics user. Defendant Cassidy admitted that he stated in his confession that he had a gun when he entered decedent's store and admitted that he had borrowed a gun from a man named Brimm early in the week previous to the fatal shooting. He admitted that, although he was a married man with five children, on the night of the fatal shooting he had taken a girl friend of his to a Philadelphia nightclub. He claimed that he smoked reefers and had secured them from Noah Hamilton. He did not know the decedent and admitted that he had never been in the store before. Upon being confronted with portions of his confession he also developed a non-retentive memory. He admitted that he had returned the gun he had borrowed from Brimm on Friday night shortly after the murder. He admitted being a heavy user of dope. He admitted that he did not know from his own personal knowledge that decedent Davis was a dealer in narcotics.
On redirect he claims that he asked his lawyer for the privilege of taking the witness stand. He also told the story that his attorney promised that he would not get the electric chair.

STATE'S CASE.

David W. Ring
This witness was in the wholesale toy business and stated that he had been doing business with the decedent for approximately five years and that he sold him $35,000 worth of toys per year at wholesale which toys would have a retail value of approximately $50,000. He stated that he had extended credit to the decedent to the extent of $20,000 and decedent was a good account. He also stated that he knew decedent was making toy purchases from other wholesalers in addition to this witness. The purpose of this evidence *35 was to establish that the decedent had a thriving business since the State felt that an effort was being made to create the impression that decedent had a small toy business and had a sideline which the defendants wanted the court to believe was dealing in narcotics.

Elmer Bertman
An attorney-at-law who represented defendant Johnson who used the gun in the fatal shooting. He was retained by the defendant Johnson's mother. The attorney stated that Johnson told him that he had smoked marijuana on the day of the killing and he was satisfied that the defendant in this respect was telling the truth. He admitted that he did not permit his client to take the stand because there had been discussions among the three attorneys and the other two attorneys were also of the opinion that they should not permit their clients to testify. He stated that he made copies of Johnson's confession and gave him a copy and also gave a copy to his client's mother. He had asked defendant Johnson whether he could deny the contents of the confession and defendant said he could not. Defendant Johnson told him he did not remember the actual facts of the particular shooting. He stated that his client did ask to take the stand, and when he was asked what he could testify to, his answer was that he did not remember. Counsel felt that this answer would make a very poor impression and would undoubtedly be harmful to the defendant. He also felt that any reference to marijuana would do this defendant no good. Several days before the State rested its case he conceived the idea that he should have written authority from his client to exercise discretion as to whether this defendant should take the stand and, therefore, prepared Exhibit S-1 which he handed to his client and gave a copy to his client's mother. He said he had his client read it and in the presence of all three defendants the attorneys discussed it and it was concluded that they would not use the defendants as witnesses. The defendant Johnson signed the statement in his *36 presence. The attorney stated that at no time prior or during the trial did the defendant Johnson ever tell him that he had gone to the decedent's store for the purpose of collecting a debt due Johnson for delivering narcotics for decedent Davis. The attorney said he had never heard of that story until this particular hearing and if he had been told that story he certainly would have used it as a defense in the trial. The decision not to use the defendants as witnesses was the result of the attorneys' thought and judgment and the attorneys had concluded that, in view of the records of two of the defendants and the other circumstances, to use them as witnesses "would be more harmful than good." The issue as the attorneys saw it was whether or not it was life or death and apparently it was their judgment that to keep the personal background of the defendants from the jury would probably result in life and not electrocution. He stated that he discussed with defendant Johnson the possible punishment and that defendant knew that life or death was the issue and that he had discussed this question with his client and his client's mother and denied that he ever promised that the defendant would not get the chair.
The application for the new trial was based on alleged newly discovered evidence. To entitle a defendant to a new trial on that ground, defendants must show that the new evidence (1) is material to the issue and not merely cumulative or impeaching or contradictory; (2) could not in fact have been discovered before such trial by the exercise of due diligence; and (3) would probably change the result if a new trial were granted. State v. Richter, 21 N.J. 421, 424 (1956); State v. Bunk, 4 N.J. 482, 486 (1950); State v. Vaszorich, 13 N.J. 99, 130 (1953).
The only evidence that might fill the requirements of that rule produced at this hearing pertains to the evidence concerning a juror who upon the voir dire was asked:
"Have you ever been the victim of a robbery, or has any of your friends or relatives ever been the victim of a robbery?"
Her answer, "No, I have not, no one that I know of."
*37 It appears that her husband was held up on three different occasions. It had happened 18 or 19 years ago and she insisted it had completely left her mind and had been recalled to her about six months after the trial of these defendants had been concluded. The fact that she had forgotten it would probably be an insufficient reason to consider her presence on the jury non-prejudicial to these defendants although the facts are not consistent with United States v. McCorkle, 248 F.2d 1 (3 Cir. 1957), certiorari denied 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957). However, she was not a member of the jury which deliberated the fate of these defendants. She had been excused before the jury began deliberation because of illness.
Her testimony at this hearing indicates that the case of these defendants was not discussed during the trial between sessions by the jury since the court had impressed upon the jurors their duty was not to discuss the case until it had been concluded and they had reached the point of deliberating on the verdict. The fact that she stated she did not recall her husband's experience until six months after the trial was concluded would justify the inference that even if there was some discussion she did not talk about her husband's experience. Nevertheless, since she was not a part of the jury which rendered the verdict it can not be said that the jury's verdict was tainted.
Defendants in their brief infer that the Prosecutor may be withholding evidence that, if produced, may indicate that the jury was composed of another individual or individuals whose presence thereon was prejudicial to these defendants. The statement of these defendants is based merely on speculation and a desire to "fish" for something to base an attack on the theory of prejudice. There appears no justification in the record for this hypothesis. The onus of establishing the elements necessary to warrant a new trial is on these defendants and their failure to carry this truth does not justify this court in drawing upon its imagination *38 as the defendants have done to conjure up a theory which lacks all basis in fact. State v. Smith, 29 N.J. 561, 579 (1959). It is true that a prosecutor has a duty to seek justice, not convictions. It is also true that a prosecutor must practice fair play in the conduct of all criminal actions. The evidence in this case indicates that the Prosecutor performed his duty.
The factual situation presented by all the other testimony would seem to suggest the strategy that such testimony if it was presented could be considered by the jury in its deliberation of life or death for these defendants. Mr. Justice Francis in his concurring opinion in State v. White, 27 N.J. 158, 184 (1958) said:
"The mental status or capacity or condition of an accused is an integral part of the act of killing. Although he may not escape a verdict of guilt because the disability of his mind does not reach the point of insanity within the legal definition, the ordinary dictates of a humane society demand that in the formulation of the moral judgment as to the degree of responsibility for purposes of punishment, the evidence of such disability or departure from the normal ought to be considered relevant and material. In deciding whether the killer should be put to death it is inconceivable that, under any modern system of law, a jury should be denied all knowledge of a mental disability, short of insanity, which operated as a motivating influence in the commission of the crime. At this point in the proceeding, guilt of the crime is no longer in question; the sole issue is punishment."
Of course this argument cannot be used to justify this motion under the doctrine of newly discovered evidence. The real basis for this argument would be the failure to comply with Article I, Paragraph 10, of our State Constitution in that these defendants, by not being called as witnesses in their defense, were deprived of "the assistance of counsel."
Our New Jersey Constitution, Article I, Paragraph 10 adopts the language of the Sixth Amendment to the Constitution of the United States:
"In all criminal prosecutions the accused shall have the right * * * to have the Assistance of Counsel for his defense."
*39 Since the Sixth Amendment applies only to trials in the federal courts the cases in which the United States Supreme Court has considered the right to the assistance of counsel in state courts have arisen under the Due Process Clause of the Fourteenth Amendment. However, the pertinent phraseology of our State Constitution is the same as that of the Sixth Amendment and, therefore, this court would give to our constitutional guarantee of the right to the assistance of counsel the same meaning and force that is attributed to the Sixth Amendment. Zasada v. State, 19 N.J. Super. 589 (App. Div. 1952).
Our State Constitution as well as the Sixth Amendment of the United States Constitution refer to "Assistance of Counsel." Our federal decisions keep referring to "effective assistance of counsel."
"The adjective `effective' came into the law in Powell v. State of Alabama (287 United States 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)) and was used by the Supreme Court to describe a procedural requirement. * * * it is clear from these opinions that the term `effective' has been used by the Supreme Court to describe a procedural requirement, as contrasted with a standard of skill. The Court (United States Supreme Court) has never held that an accused is entitled to representation by a lawyer meeting a designated aptitude test. It has never used the term to refer to the quality of the service rendered by a lawyer. The Court (United States Supreme Court) has clearly established that an indigent accused is entitled to counsel, if he wants one, despite his inability to pay for the service; that appointed counsel must have reasonable opportunity to prepare for his task of defense; and that the lawyer so appointed must have no divergent interest. But the Court (United States Supreme Court) has not itself undertaken, nor has it imposed upon the inferior federal courts, the duty of appraising the quality of a defense. (Emphasis supplied.) * * * it has been repeated so many times as to become axiomatic that convicted felons almost unanimously relish the prospect of putting to public judicial test the competence of their erstwhile defenders; that almost any judge or lawyer can point to potential mistakes in reviewing the record of a lost cause; and that even trial counsel, having lost, can almost invariably enumerate what in the hindsight of disaster appear to have been errors." Mitchell v. United States, 104 U.S. App. D.C. 57, 259 F.2d 787 (1958); certiorari denied 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958).
*40 Even with the wisdom of hindsight it cannot be said with assurance whether the decisions and strategy of counsel were wise or unwise. But they were not such as to justify a ruling that defendant did not have effective assistance of counsel and is entitled to have a second trial. See Bolden v. United States, 105 U.S. App. D.C. 259, 266 F.2d 460 (D.C. Cir. 1959); Diggs v. Welch, 80 U.S. App. D.C. 5, 148 F.2d 667, 669 (D.C. Cir. 1945), certiorari denied 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002.
Diggs v. Welch, supra, most aptly stated the position of our courts in applications of this type by convicted felons:
"The Supreme Court [United States] has been jealous in preserving the right of every accused to a fair trial. It has held that a defendant's right to assistance by counsel is not satisfied by the mere formality of an appointment of an attorney by the court. There must be `effective' representation. We are aware that if that word be construed in a broad and liberal sense it would follow that on habeas corpus the court would have to review the entire trial and consider all the alleged mistakes, failures to object to the introduction of evidence and errors in advice which the ingenuity of a convict could set down on paper during the enforced leisure of his confinement * * *.
The result of such an interpretation would be to give any Federal prisoner a hearing after his conviction in order to air his charges against the attorney who formerly represented him. It is well known that the drafting of petitions for habeas corpus has become a game in many penal institutions. * * * the opportunity to try his former lawyer has its undoubted attraction to a disappointed prisoner. * * * he may realize that his allegations will not be believed but the relief from monotony offered by a hearing in court is well worth the trouble of writing them down. To allow a prisoner to try the issue of the effectiveness of his counsel under a liberal definition of that phrase is to give every convict the privilege of opening a Pandora's box of accusations which trial courts near large penal institutions would be compelled to hear.
* * * few trials are free from mistakes of counsel. How much these mistakes contributed to the result can never be measured. There are no tests by which it can be determined how many errors an attorney may make before his batting average becomes so low as to make his representation ineffective. The only practical standard for habeas corpus is the presence or absence of judicial character in the proceedings as a whole.
For these reasons we think absence of effective representation by counsel must be strictly construed. It must mean representation *41 so lacking in competence that it becomes the duty of the court or the prosecution to observe it and to correct it. We do not believe that allegations even of serious mistakes on the part of an attorney are ground for habeas corpus standing alone."
A defendant who appears before the court with counsel employed for his defense is not deprived of his constitutional right to assistance of counsel merely because in retrospect he concludes that such representation did not meet the standard of effectiveness. United States v. Malfetti, 125 F. Supp. 27, 29 (D.C.N.J. 1954).
In Norman v. United States, 100 F.2d 905, p. 906 (6 Cir. 1939), the defendant complained that her attorney dissuaded her from testifying and also failed to call witnesses who were ready to testify as to her reputation as to truth and veracity because the attorney felt that if she testified her reputation would be put in issue by the evidence which the Government possessed derogatory to that reputation and the court held:
"There are state decisions which hold that a new trial in a criminal case should be granted where the negligence of counsel is great or his mistake of law so serious as to deprive the defendant of the benefit of the important and material evidence which might reasonably cause the jury to return a different verdict."
The court went on to say these cases "do not reach this case."
In People v. Logan, 137 Cal. App.2d 331, 290 P.2d 11 (Cal. D. Ct. App. 1955), where the affidavit stated that defendants would have testified and would have called witnesses except for the advice of their attorneys, but they did not state that defendants or their witnesses would have given testimony contradictory of that introduced by the People, a claim by a defendant that his attorney exercised his own judgment and rejected the suggestions of the client during the trial is not a ground for granting a new trial.
In People v. Brothers, 347 Ill. 530, 180 N.E. 442 (Sup. Ct. 1932), a similar point was raised and that court disposed of the question by stating:
*42 "Another ground urged for a new trial is that defendant was advised by his counsel not to take the stand, and in pursuance of such advice did not testify. It is urged that such advice was improper and resulted in serious injury to defendant. Whether or not it was prudent for defendant to testify in his own behalf was a matter for consideration and determination by him and his counsel at the time of the trial. It does not appear from the record that his counsel were either incompetent or unfaithful. Such being the case, the wisdom of the conclusion reached by defendant and his counsel cannot now be questioned."
"Where the defense is conducted by counsel selected by defendant or by those to whom he entrusted that duty, it is only under very exceptional circumstances that a new trial will be granted on account of the manner in which the defense was conducted, or on account of a subsequently asserted dereliction of duty on the part of such counsel, and where it appears that in consequence of such dereliction of duty the defendant may have been unjustly convicted." State v. Lindstrom, 180 Minn. 435, 231 N.W. 12 (Minn. Sup. Ct. 1930).
"Where an accused is represented by counsel and the basis of his claim is that he received poor advice, indicative of poor judgment on the part of his attorney, and acted thereon to his detriment, those facts, even if substantiated, do not amount to a denial of the right of representation." People v. Logan, supra [137 Cal. App.2d 331, 290 P.2d 13.] People v. Miller, 114 Cal. 10, 45 P. 986 (Sup. Ct. 1896); People v. Lennox, 67 Cal. 113, 7 P. 260 (Sup. Ct. 1885); People v. Kirk, 98 Cal. App.2d 687, 220 P.2d 976 (D. Ct. App. 1950); People v. Gilbert, 25 Cal.2d 422, 154 P.2d 657 (Sup. Ct. 1944); People v. Ynostroza, 105 Cal. App.2d 332, 232 P.2d 913 (D. Ct. App. 1951); People v. Morton, 100 Cal. App.2d 269, 223 P.2d 259 (D. Ct. App. 1950).
To one charged with the administration of justice it is unwarranted to make the statement that perjury is forgivable but in this case where the extreme penalty is involved it is understandable. This court has been sympathetic *43 to the plight of these three young men. It has searched for the truth. It is now convinced that substantial truth rests in the record of the original trial. The late Mr. Justice Cardozo in his concurring opinion in People v. Shilitano, 218 N.Y. 161, 112 N.E. 733, 739 L.R.A. 1916 F, 1044 (Ct. App. 1916), plainly outlined this court's duty when he wrote:
"* * * I do not mean that to justify a new trial, he must have been convinced  firmly or with a sense of certainty convinced  that the first story of the witnesses was false and that their new story was true. He might act upon a reasonable probability. But if, on the contrary, he was convinced that the second tale was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked. * * * He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumph. He was charged with a responsibility to seek the truth himself."
"If new trials were to be granted on such evidence as proffered here the number of times a new trial must be had would depend solely on a defendants' ingenuity, industry and imagination." State v. Bunk, 4 N.J. 462, 490 (1950).
The application lacks merit and is, therefore, denied.