327 F.2d 311
 UNITED STATES of America, ex rel. Sylvester JOHNSON, Appellant,
v.
Howard YEAGER, Principal Keeper of the New Jersey State Prison.
UNITED STATES of America, ex rel. Stanley CASSIDY, Appellant,
v.
Howard YEAGER, Principal Keeper of the New Jersey State Prison.
UNITED STATES of America, ex rel. Wayne GODFREY, Appellant,
v.
Howard YEAGER, Principal Keeper of the New Jersey State Prison.
 Nos. 14187-14189.
 United States Court of Appeals Third Circuit.
 Argued April 24, 1963.
Decided July 17, 1963, Rehearing Denied in Nos. 14187 and
14189 Jan. 24, 1964, On Rehearing in No. 14188
Jan. 24, 1964.
 
 Curtis R. Reitz, Philadelphia, Pa. (Stanford Shmukler, Philadelphia, Pa., M. Gene Haeberle, Camden, N.J., on the brief), for appellants.
 Norman Heine, Camden County Prosecutor, Camden, N.J., for appellee.
 Before KALODNER, HASTIE and GANEY, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 Three New Jersey state prisoners, under sentence of death for first-degree murder, have taken these appeals from an order of the United States District Court for the District of New Jersey denying their petition for habeas corpus.[1] The principal contention of the appellants is that due process of law has been denied them because confessions which do not satisfy the constitutional standard of voluntariness were used as evidence against them at their trial. The district court resolved this issue against the appellants on the basis of the evidence that was before the New Jersey courts. On this appeal we shall consider only those facts which have been found judicially or cannot reasonably be disputed in the light of the showing in the record.
 
 
 2
 At the trial the prosecution undertook to prove that the three appellants drove in appellant Godfrey's car to a store operated by the decedent, with a common purpose to commit robbery; that Godfrey remained in the car while the other two entered the store; and that in the course of the attempted robbery Johnson fatally shot the storekeeper. Thus, under the prosecution's case, as presented, it was essential to a conviction of first-degree murder that robbery be established as the objective of the enterprise. All three appellants had signed confessions admitting that their purpose was to rob the storekeeper. These confessions were essential items of proof on this issue.
 
 
 3
 In this habeas corpus proceeding, the appellants, who do not deny the killing, contend that they were coerced into admitting that they were engaged in robbery, when in fact their purpose in going to the store was to collect a debt owed by the storekeeper to appellant Johnson.
 
 
 4
 None of the appellants testified at the trial, either as to the manner in which the confessions were obtained or for any other purpose.[2] The only testimony given at the trial concerning the confessions was that of the officers and stenographers who were present during the initial detention and interrogation of the prisoners or when the formal statements of the prisoners were made and transcribed. The appellants did testify, more than a year later, at a hearing on their motion for a new trial. The New Jersey courts have considered this testimony on the issue of alleged coercion, and it was properly considered by the district court in this habeas corpus proceeding.
 
 
 5
 On the record thus made, important differences in the circumstances of the three confessions appear. Accordingly, we shall discuss matters relevant to each confession separately.
 
 WAYNE GODFREY
 
 6
 The killing took place on Friday, January 24, 1958, at about 6:10 P.M. Godfrey was arrested at about 1:30 the following Tuesday afternoon. He was taken to detective headquarters in the Camden courthouse, where he remained until 10:30 Wednesday morning, when he was taken to the office of the Chief of Detectives for the transcription of a formal confession. There, in answer to questions put to him by Detective Chief Dube, he made the confession which was later introduced into evidence.
 
 
 7
 Throughout the case, the New Jersey courts have emphasized, as appellee does here, that on the occasion of this formal confession Godfrey was treated civilly and interrogated in a proper and polite manner. On that occasion the prisoner was submissive, talking freely and without necessity for any great urging. If only the occurrences in the office of Chief Dube are considered, the confession appears to be voluntary. However, for reasons to be elaborated later, we think this restricted view of the matter in issue has unduly influenced the entire judicial consideration of the claim that the confession was coerced. The events preceding the formal confession must be considered as well as its immediately attendant circumstances.
 
 
 8
 The testimony of police officers, given at the trial, concerning the 20-hour period immediately preceding Godfrey's formal confession was sketchy, but nevertheless revealing. It was admitted that the prisoner spent this whole period, including the entire night, in a room at the detective bureau in the Camden courthouse where he was detained and questioned.
 
 
 9
 Little appears concerning the first few hours of detention. The police testified that they took the prisoner after his arrest to a room in the detective bureau where all of his clothes were removed. Subsequently he was given coveralls obtained from the city jail. The police officers did not say how long the prisoner remained naked before coveralls were obtained. At the subsequent hearing Godfrey testified that he had remained naked about an hour. There was no testimony to the contrary. Finally, a police captain testified at the trial that 'when he (Godfrey) was first arrested he was asked some questions by some members of the City Detective Bureau.'
 
 
 10
 The police were more informative as to events beginning about 8:00 P.M. and continuing through the night until 10:30 the following morning. Almost all of this time was spent in the conference room of the detective bureau. Questioning by relays of police officers, seven of whom are identified in the record, continued intermittently throughout the night and into the next morning until the desired confession was obtained. Most of the time the prisoner was kept sitting in a chair. At no time during the night was he given an opportunity to lie down. One officer had no recollection of the prisoner sleeping. Another remembered that the prisoner would doze off and be aroused by further questioning. Another remembered that the prisoner drank much coffee. It was in mid-morning, at the end of this phase of interrogation, that the prisoner was taken before Chief Dube for the formal confession which proceeded smoothly and without apparent reluctance on Godfrey's part.
 
 
 11
 With this much in the record, Godfrey's counsel objected 'to the admission in evidence of the confession * * * on the basis that it was taken after a prolonged period of interrogation from 1:30 Tuesday afternoon, January 28, 1958, until sometime after eleven o'clock, January 29, 1958, the following day'. The court ruled, however, that Godfrey's confession was voluntary and admitted it.
 
 
 12
 At the hearing on the appellant's motion for a new trial, it was established that Godfrey had been examined by a psychiatrist employed by the State of New Jersey. The psychiatrist found that Godfrey, a 27-year-old laborer with a seventh grade education, was 'an inadequate individual with impaired psychological conditioning'. Moreover, a special psychological examination, also made by a state expert, revealed 'a rather disturbed individual who has definite schizoid tendencies'. Godfrey himself gave undisputed testimony that he was a regular user of marijuana and an occasional user of heroin. He also testified that throughout the morning of his arrest, and thus only a few hours before interrogation began, he had been smoking marijuana cigarettes.
 
 
 13
 The total picture is illuminated by the conduct of the police in denying Godfrey access to friends, counsel or a magistrate until the interrogation had produced a full confession. New Jersey law requires that an arrested person be taken promptly before a magistrate. N.J. Rules 3:2-3(a). Godfrey testified, and the police have not denied, that during the course of his detention he asked without avail for counsel. Such behavior by the police strongly indicates a determination to keep the prisoner under pressure of interrogation until the desired admissions have been obtained. See Haynes v. Washington, 1963, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513.
 
 
 14
 The total picture of what happened to Godfrey must be evaluated in the light of the substantial body of Supreme Court decisions concerning confessions induced by coercive tactics short of physical violence. It is clear that illegal detention of a suspect for a long time without taking him before a magistrate does not in itself compel the conclusion that a confession obtained during that period has been coerced. Stein v. New York, 1953, 346 U.S. 156, 186-188, 73 S.Ct. 1077, 97 L.Ed. 1522; Stroble v. California, 1952, 343 U.S. 181, 196-197, 72 S.Ct. 599, 96 L.Ed. 872. But interrogation during such detention may be so prolonged, insistent and exhausting that the resultant confession must be deemed the product of coercion rather than free choice. Ashcraft v. Tennessee, 1944, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192. Ashcraft had been questioned, without opportunity for rest, by relays of officers for 36 hours. Though he was a mature, self-possessed, 45-year-old businessman, without any significant weakness or susceptibility to overreaching, the Supreme Court concluded that a confession produced by such long and exhausting interrogation must be deemed involuntary. It is arguable that any interrogation like that to which Godfrey was subjected in this case-- from late afternoon or early evening, all through the night and well into the next morning-- should be deemed intolerably coercive, even to a self-possessed man of strong will, as was the 36-hour questioning of Ashcraft. However, we need not go that far. Other cases make it clear that factors in addition to the length of the period of interrogation are relevant and often controlling.
 
 
 15
 In Haley v. Ohio, 1948, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224, the suspect was a 15-year-old boy whose immaturity made him more susceptible than an adult to the pressure of persistent interrogation by officers of the law. The police began questioning young Haley at midnight and continued until they obtained the desired confession at 5:00 A.M. The inevitable coercive effect of that much interrogation at that time of night upon a 15-year-old boy was held to be sufficient to make his confession involuntary.
 
 
 16
 In Spano v. New York, 1959, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, a 25-year-old man with a history of emotional instability was questioned from 7:15 P.M. until he confessed at 3:25 A.M. In finding that the confession drawn from this man after an eight-hour grilling was not voluntary, the court emphasized the inevitable effect of fatigue as interrogation continued through the late hours of the night.[3]
 
 
 17
 Other cases have involved repeated questioning for individual periods of a few hours each over five or six days until the prisoner has confessed. When such pressure has been used upon a prisoner shown to be unstable or otherwise susceptible to overreaching, the Supreme Court has not hesitated to find the resultant confession involuntary. Fikes v. Alabama, 1957, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Watts v. Indiana, 1949, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Turner v. Pennsylvania, 1949, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810.
 
 
 18
 We think this entire body of decisions leaves little doubt about the proper characterization of Godfrey's confession. The inference of coercion from exhausting interrogation throughout a sleepless night and into the following day is in itself very strong. When we add the testimony of disinterested state-employed experts as to Godfrey's psychic inadequacy, Godfrey's own unrefuted testimony of his regular use of drugs and his smoking of marijuana a few hours before interrogation began, and the refusal of the police during the 21-hour period of detention and interrogation to take the prisoner before a magistrate or to allow him access to counsel, we cannot avoid the conclusion that the prisoner's ultimate admission that he had gone to the decedent's store for the purpose of committing robbery was not made voluntarily.
 
 
 19
 In reaching a contrary conclusion, the courts of New Jersey seem to have reasoned that the civil manner in which Detective Chief Dube questioned Godfrey at 10:30 Wednesday morning and the prisoner's submissiveness at that time cured or made irrelevant the events of the preceding 21 hours. However, the Supreme Court has pointed out more than once that precedent coercion may have a persisting invalidating effect upon a confession given without apparent reluctance in response to civil questioning in pleasant surroundings. See, e.g., Brown v. Mississippi, 1936, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; Reck v. Pate, 1961, 367 U.S. 433, 444, 81 S.Ct. 1541, 6 L.Ed.2d 948.
 
 
 20
 In this case, despite the propriety of Detective Chief Dube's interrogation, several circumstances affirmatively indicate that the pressures which induced the preceding informal admissions continued.
 
 
 21
 Weariness to the point of exhaustion is cumulative. The prisoner was still without sleep or rest after the nightlong interrogation when he was taken to Chief Dube's office. The very police officers who had obtained his informal confession were present as silent spectators while Chief Dube conducted the interrogation. Chief Dube, though civil and careful to admonish the prisoner to tell the truth, never indicated in any way that the prisoner was free to remain silent. To the contrary, he indicated from the outset that he was expecting the prisoner to relate a story of armed robbery. Thus, he began his interrogation by saying, 'I want to ask you what you know about that hold-up'. We think the prisoner must have understood that the ordeal of the last 21 hours would not be ended until he should repeat in a formal way what he had already told the interrogating police officers. Thus, the final questioning by Chief Dube was a culmination of pressure rather than a release from pressure. The answers given in response to his questioning cannot be said to have been voluntary.
 
 STANLEY CASSIDY
 
 22
 Police officers went to Cassidy's home at 4:00 A.M. on Wednesday following the killing, awakened him, placed him under arrest, and took him to detective headquarters. During the next 20 hours, Cassidy made three formal statements to Detective Chief Dube which were admitted in evidence at the trial. As in the case of Godfrey, there is no doubt that the questioning of Cassidy in Detective Chief Dube's office was conducted in a civil manner. Once again, however, it is argued that events preceding these formal statements prevented them from being voluntary.
 
 
 23
 Five hours elapsed between Cassidy's arrest and the beginning of his first formal statement. During that period, he was questioned by several detectives. The intensity of the interrogation does not appear in the testimony of the officers at the trial. Cassidy's testimony at the hearing on the motion for a new trial, that he was questioned continuously from the time he was arrested until he was taken to Detective Chief Dube's office at 9 A.M., has not been denied. However, his testimony that he was physically abused-- specifically, that one of his interrogators angrily threw a book at him-- was disputed by testimony, and the court which heard this testimony chose to disbelieve Cassidy, relying to a substantial extent on the fact that he had waited more than a year after the event before mentioning the alleged abuse. We think that this was an allowable evaluation of the testimony which is adequately supported by the record. The district court was within its discretion in refusing to treat this case as one in which physical violence has been established. We accept that determination.
 
 
 24
 In view of the paucity of the available evidence concerning the interrogation which preceded Cassidy's first formal statement, his characterization of that statement as coerced perforce depends greatly upon his own testimony that he was a 'heavy user of narcotics', especially marijuana, and upon statements of state-employed psychiatrists and psychologists concerning Cassidy's mental condition. Cassidy was 25 years old at the time of the crime. He had an eighth grade education. In one psychologist's report he is described as 'an extremely inadequate, regressed, passive individual.' A psychiatric report describes him as a 'highly conflicted, immature, individual' with 'deep feelings of incompetence'. He is also characterized as 'an inadequate personality who needed narcotics to alleviate his present anxieties'.
 
 
 25
 We recognize that such a person is likely to be less able than the average individual to withstand insistent and protracted grilling by the police. On the evidence adduced at trial, as supplemented by the showing made in support of the motion for a new trial, the district court might have found that Cassidy's first statement was the product of coercion. But we cannot say that such a conclusion was rationally unavoidable. Certainly the prisoner was not subjected to more than four hours of questioning, probably less, during the early morning detention which preceded his first full confession. The record simply does not yield an unmistakable picture of a man exhausted or overcome by an ordeal at that time.
 
 
 26
 Cassidy's first statement was a comprehensive admission of guilt. In it he acknowledged that the purpose of going to the decedent's store had been to 'get some money' by force and that Johnson had shot the decedent in the course of carrying out that purpose. It is true, Cassidy persistently denied that they had intended to accomplish their purpose by the use of firearms. Thus, he denied that he, himself, had taken a gun to the decedent's store, and he disclaimed any knowledge preceding the killing that Johnson had a gun. His stated reaction when the shooting occurred was that 'I didn't know he had a pistol, it was just supposed to be a strong-arm job'. Nevertheless, the facts admitted in the first statement disclosed the essential elements of murder in the course of robbery.
 
 
 27
 It is difficult to understand what proper purpose the police were pursuing when they continued to interrogate Cassidy after his first statement instead of taking him without further delay before a magistrate for a preliminary judicial hearing. In the absence of explanation, the natural inference is that the police, not satisfied with the strong evidence which had already been elicited, were determined to press the prisoner until his account of the crime under investigation should become impressively elaborate. Such determination has marked many cases in which the Supreme Court has upset state convictions obtained through the use of confessions, for it evinces the kind of coercive atmosphere in which otherwise constitutionally innocuous improprieties may assume a threatening quality. See Haynes v. Washington, supra; Gallegos v. Colorado, 1962, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325; Malinski v. New York, 1945, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; cf. Spano v. New York, supra, 360 U.S. at 323-324, 79 S.Ct. at 1207. It is our duty to scrutinize the circumstances pertaining to the second and third confessions closely.
 
 
 28
 Two hours after his first statement, Cassidy was taken to Detective Chief Dube's office again, and there made the second statement. In it he confessed, in contradiction of his first statement, that he had taken a pistol on the expedition which resulted in the killing. The damaging inference of felonious purpose is obvious. The only testimony at the trial concerning the period between the first and second statements was that of Chief Dube, who could say no more than that 'after he (Cassidy) had made the first interrogation, and the answers were read back to him, ending around 10:25, he was taken out of the room. * * * I presume that he was taken in one of the other rooms in the Prosecutor's office where he was kept until I talked to him later at 12:15'. The only evidence of any improper conduct during this two-hour interval appears in Cassidy's testimony at the hearing on motion for a new trial, where he testified as follows:
 
 
 29
 'I remember when I made my first confession I told Chief Dube that I didn't have the gun and the Prosecutor came and got me and asked me did I have a gun at home at all. I said no at first because the gun did not belong to me. He said, 'well, look, if you have a gun at home, all we want to do is check it, (to) see if it has been fired'. He said 'We won't use this as evidence against you if it hasn't been fired."
 
 
 30
 If the Prosecutor did give the prisoner this assurance, it is arguable that the rules of evidence should exclude an admission thus obtained in exchange for a promise of favorable treatment. See Shotwell Mfg. Co. v. United States, 1963, 371 U.S. 341, 348, 83 S.Ct. 448, 9 L.Ed.2d 357 (dictum) (federal prosecution); Crawford v. United States, 5th Cir. 1955, 219 F.2d 207 (semble) (federal prosecution). See generally Bram v. United States, 1897, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (federal prosecution); Maguire, Evidence of Guilt, 1959, p. 139. But such a bargain is an improper means of persuasion rather than a device of compulsion. It may produce a statement that is untrustworthy because a suspect may be induced to incriminate himself falsely when he is led to believe that all things considered, he will gain thereby. But bargaining for a confession is not shocking and outrageous in the way that third degree methods are. Probably for this reason, courts have not heretofore made the rule which excludes testimony induced by promise of favor a constitutional mandate.
 
 
 31
 Cassidy did not assign as a basis for his motion for a new trial or as a ground for federal habeas corpus that his admissions concerning his gun had been induced by a promise not to use this evidence against him. Thus, no ruling in this regard is presented for appellate review. In thus disposing of the matter, we do not hold or imply that a finding of such inducement would entitle the prisoner to relief on constitutional grounds.
 
 
 32
 Little can be added concerning the third statement, taken eleven hours later, in which Cassidy substantially discredited his earlier protestations of ignorance before the shooting that Johnson had a pistol. All we know about that statement and the events which preceded it is that Detective Chief Dube could testify only that he believed Cassidy 'had been placed in the detention room in the Detective Bureau, where he was told to rest or do whatever he chose to do until I next asked for him that evening'. The only constitutional objection which could be made to the use of the third statement would be that the coercive effect of official conduct preceding the earlier statements had influenced the third statement as well. See Reck v. Pate,supra, 367 U.S. at 444, 81 S.Ct. at 1548. But we already have concluded that the evidence concerning the earlier statements does not require a finding that they were coerced.
 
 SYLVESTER JOHNSON
 
 33
 Johnson, who admittedly fired the fatal shot, also made a full confession and contends that his admission of an attempted armed robbery was coerced.
 
 
 34
 Johnson was apprehended in Newark the day after the arrest of the other appellants. He was taken into custody at 5:00 P.M. and was promptly taken before a magistrate in Newark. Thereafter, he was detained in Newark until 2:00 A.M. when Camden police officers removed him by automobile to Camden. Shortly after arrival, he was taken to Detective Chief Dube's office and at 4:45 A.M. readily made the confession which was later introduced in evidence. At the hearing on the motion for a new trial, Johnson testified that police officers struck him, both in Newark and during the drive from Newark to Camden. As in the case of Cassidy, this testimony was disputed, and the court which heard it disbelieved it. We accept that determination.
 
 
 35
 There was no evidence of more than routine questioning in Newark and no indication that it was long-continued. Similarly, there was no evidence of-- indeed, no time for-- any substantial interrogation in Camden between arrival and the formal confession in Chief Dube's office. It is clear that Johnson was questioned during the automobile ride from Newark to Camden. But, once the testimony of physical violence is discredited, we cannot say that either the nature of the interrogation or its duration made the experience grueling.
 
 
 36
 Here again, recognizing that the record does not establish a long continued and exhausting grilling, the appellant emphasizes the state's own psychiatrist's report concerning him. Johnson, who had a seventh grade education, was 21 years old at the time of the killing. A state psychologist reported of him that 'the impression of the examiner at the present time is that this is an insecure, grossly inadequate, poorly integrated schizoid personality whose stability and judgment goes to pieces under douress and stress'. A psychiatrist found that the prisoner exhibited 'intense feelings of insecurity and inadequacy which were conspicuous throughout his entire life'. But, taking this instability and inadequacy of personality into account, we think the kind and amount of pressure established in this record is not enough to compel a conclusion that Johnson's confession was not voluntary. Therefore, we cannot find a denial of due process in the state's use of Johnson's confession as evidence against him.
 
 
 37
 Finding only Godfrey's confession to have been involuntary on the record before us, we have considered whether the admission of that confession itself affected the constitutional rights of Cassidy and Johnson. The introduction of a coerced confession in evidence against one defendant is not in itself the imposition of constitutional wrong upon his co-defendant. Stein v. New York, supra, 346 U.S. at 194-196, 73 S.Ct. at 1097-1098; Malinski v. New York, supra, 324 U.S. at 410-412, 65 S.Ct. at 786. The jury was instructed to consider each confession as evidence against its maker only. And here we have the additional consideration that substantially the same information was placed before the jury in the confessions of Cassidy and Johnson as in the confession of Godfrey. In these circumstances, we think it is not reasonable to believe that the jury would or, indeed, had any occasion to go beyond Cassidy's and Johnson's own confessions and use similar statements in Godfrey's confession against them.
 
 
 38
 For these reasons the judgment will be reversed as to Godfrey and remanded to the district court with instructions to grant the writ without prejudice to the right of the state to try him again. As it affects Cassidy and Johnson, the judgment will be affirmed.
 
 
 39
 PER CURIAM.
 
 
 40
 This appeal of Stanley Cassidy has been reargued pursuant to the appellant's motion for rehearing. The court has reconsidered its ruling that the record does not require a conclusion that Cassidy's confession was coerced. The court has also considered the appellant's contention, strongly urged at reargument, that the court below erred in not taking testimony at the hearing on this petition for habeas corpus.
 
 
 41
 It does not appear that the appellant stated or in any way made manifest to the district court a desire to present anything evidentiary other than the record of the various proceedings in the state court, including reports concerning his mental condition and capacity, upon which the district court predicated its decision. In the circumstances, we think there was no occasion for the court to call for the introduction of testimony.
 
 
 42
 On the entire case, we reaffirm our decision that the judgment of the district court should be affirmed.
 
 
 43
 GANEY, Circuit Judge (dissenting).
 
 
 44
 The focal point of inquiry here concerns itself with whether the statement obtained from Stanley Cassidy after a series of questionings was a voluntary one.
 
 
 45
 The norm or criterion of voluntariness as to whether or not a confession meets the standards of admissibility, requisite under the due process clause of the 14th Amendment, has been set forth clearly and precisely in the scholarly opinion of Mr. Justice Frankfurter in Culombe v. Connecticut, 367 U.S. 568, 601-602, 81 S.Ct. 1860, 1878-1879, 6 L.Ed.2d 1037 (1961).
 
 
 46
 'No single litmus-paper test for constitutionally impermissable interrogation has been evolved * * *. The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker?'
 
 
 47
 Stanley Cassidy was arrested and taken from his home in Camden, New Jersey, Jan. 29, 1958 at four o'clock in the morning and taken to the Camden police station and questioned by Captain Phillip Large and six detectives. He was searched, stripped of his clothing, given some coveralls, brought in and questioned by Chief Dube. This questioning in the presence of three detectives began at nine in the morning and continued until ten-twenty in the morning. He was then placed in a room adjacent to the office in which he was questioned and returned for further questioning twelve-fifteen to twelve-forty-five p.m. on the same day, and brought back at twenty minutes of twelve that same night and again until a quarter of one the next morning Jan. 30. In spite of the fact that there was testimony at the trial by those who questioned him that they did not abuse him nor threaten him in the securance of the statements, there can be no question in my mind here, but that the police, by keeping after Cassidy as shown by the repeated questionings, put to him in the early morning hours of Jan. 28 until the early morning hours the following day-- though intermittently-- could be anything but a persistent endeavor by them to secure from him finally answers which they wanted and those answers were admissions of guilt. Sufficient information had been elicited in his second interrogation, if not in the first one by the police officers, to construct a case of murder against him by independent research and by a normal police investigation, and no useful purpose was served by the questioning of him at the close of a long day and into the early morning hours of the following day, other than to draw from him the admission that he knew Johnson, one of his confederates, possessed a gun at the time of the robbery and the ensuing killing by Johnson. I deem this conduct in and of itself over-reaching and coercive.
 
 
 48
 In discussing those essentials of due process to be accorded an individual accused of crime, the court again speaking through Justice Frankfurter in Culombe v. Connecticut supra 581 (367 U.S. 581, 81 S.Ct. 1867) stated,
 
 
 49
 'Cardinal among them, also, is the conviction, basic to our legal order, that men are not to be exploited for the information necessary to condemn them before the law, that, in Hawkins' words, a prisoner is not 'to be made the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown (8th ed. 1824), 595. * * * Its essence is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips. See Blackburn v. Alabama, 361 U.S. 199, 206-207 (80 S.Ct. 274, 4 L.Ed.2d 242); Chambers v. Florida, 309 U.S. 227, 235-238 (60 S.Ct. 472, 84 L.Ed. 716).'
 
 
 50
 Accordingly I am unable to be persuaded that Cassidy's confession was, 'the product of an essentially free and unconstrained choice by its maker'. I would grant the petition.
 
 
 
 [1]
 The original convictions in the Camden County Court were affirmed by the New Jersey Supreme Court. State v. Johnson, 1960, 31 N.J. 489, 158 A.2d 11. Thereafter, on motion for a new trial, the trial court heard evidence on a claim that the confessions used at the trial had been coerced and filed an opinion denying the motion. State v. Johnson, 1960, 63 N.J.Super. 16, 163 A.2d 593. This judgment was affirmed, State v. Johnson, 1961, 34 N.J. 212, 168 A.2d 1, and certiorari denied, 368 U.S. 933, 82 S.Ct. 370, 7 L.Ed.2d 195. This federal habeas corpus petition followed
 
 
 [2]
 In the subsequent hearing on the motion for a new trial, each testified that he had wished to take the stand but that he had been dissuaded by his lawyer. The New Jersey Supreme Court held that counsel's action was an entirely proper exercise of professional judgment. 34 N.J. 212, 223, 168 A.2d 1, 6
 
 
 [3]
 In an entirely different context, the coercive effect of fatigue when rest is denied throughout the night has been recognized in this circuit. In United States ex rel. Leguillou v. Davis, D.V.I.1953, 115 F.Supp. 392, rev'd on other grounds, 3d Cir. 1954, 212 F.2d 681, a jury had been required to hear a criminal case all day and then to deliberate all night until a verdict of guilty was returned at 6:00 A.M. This verdict was held to have been coerced and to represent a denial of due process of law