**UNITED STATES of America ex rel. John L. HART**

v.

**James F. MARONEY, Superintendent, State Correctional Institution, Pittsburgh, Pennsylvania.**

**Civ. A. No. 62-613.**

United States District Court
W. D. Pennsylvania.

May 22, 1964.

burgh, Pennsylvania and serving a life sentence on a charge of murder.

His petition to this court is for a Writ of Habeas Corpus and appointment of counsel to represent him. Based upon the averments contained in his petition, he was allowed to proceed in forma pauperis and a rule was granted to show cause why a writ of habeas corpus should not be granted.

This Court appointed Joseph Schuchert, Esquire, as his attorney, but subsequently H. David Rothman, Esquire, entered his appearance for the petitioner and represented him by brief and at the hearing.

The questions here substantially are:

1. Did the evidence at the state trial establish that the killing by the defendant occurred in the perpetration of a robbery within the meaning of the Pennsylvania Felony Murder Rule?

2. Was the petitioner, as the defendant at his trial adequately represented by counsel?

3. Was the admission into evidence, at the state trial, of testimony from a transcribed tape recording of a conversation between the then defendant and the Prosecuting Attorney prejudicial to the petitioner?

These questions were presented and determined in an appeal to the Pennsylvania Supreme Court. Commonwealth v. Hart, Appellant, 403 Pa. 652, 170 A. 2d 850 (1961), cert. den. 368 U.S. 881, 82 S.Ct. 130, 7 L.Ed.2d 81.[1]

A concise résumé of the facts in the record, which I here adopt, is contained in the opinion of Mr. Chief Justice Bell.

J. S. Schuchert, Jr., and H. David Rothman, Pittsburgh, Pa., for relator.

ROSENBERG, District Judge.

The petitioner is now confined in the State Correctional Institution at Pitts-

---

[1]. It does not appear here that the petitioner has exhausted his state remedies. Judge Kalodner of the Court of Appeals for the Third Circuit in United States of America ex rel. Melton v. Hendrick, 3 C.A., 1964, 330 F.2d 263, at page 267 in Note 5 said: "In Note 7, 218 F.Supp. at p. 296, the District Court expressed doubt as to whether Melton had exhausted his state remedies with respect to his contention that he had been subjected to cruel and unusual punishment in violation of federal constitutional rights. On that score we need only say that In re Ernest's Petition, 3 Cir., 294 F.2d 556, pp. 561, 562 (1961), cert. den. 368 U.S. 917, 82 S.Ct. 198, 7 L.Ed.2d 132, we expressly held that: 'Denial of a state prisoner's petition for habeas corpus on its merits remains permissible under Section 2241 even though state remedies may not have been exhausted' ".

At page 655 of 403 Pa., page 852 of 170 A.2d, it is stated:

"The following is a brief summary of what the jury could justifiably have found from the evidence: Defendant and Patricia K. lived together. He rented her out as a prostitute. Querey, the deceased victim, after his mother's death, came from North Carolina to Pennsylvania to collect her life insurance. He collected the insurance and on his way home engaged Patricia through a cab driver for purposes of intercourse. The price was $50. He paid her the $50 and also bought her some, presents. Patricia remained some time and after it was over went back to the Naples Restaurant to meet defendant. She gave defendant $50. He became very angry because his price was $50 an hour and she had stayed three hours. Defendant shouted at her and said 'You are going out and see that man with me.' He said the man was trying to get something for nothing. Patricia was afraid to tell defendant that Querey had bought her presents because he had told her that if she ever let anybody buy her anything he would beat her —which he had already done on a prior occasion. Defendant and Patricia, at his insistence, went to the Airport to see Querey to get the additional money to which he claimed he was entitled. They knocked on Querey's door and telephoned repeatedly but unsuccessfully. Defendant insisted they try once again and after defendant banged very loudly on Querey's door he forced Patricia to call Querey once more. Querey then opened the door slightly. Defendant pushed the door open and pushed Patricia inside. Then Querey asked: 'What's this all about?' Defendant answered 'I think you owe this girl some money." Querey denied knowing Patricia and told defendant to get out. Patricia begged defendant to leave the room, but defendant replied he wanted that money. Querey threatened to call the police. He went to the phone and defendant followed him. They began struggling over the telephone. Patricia begged defendant to leave Querey alone. Querey started to put his leg in his trousers and at that point, defendant who was 6 feet 4 inches tall and weighed 170 pounds, started hitting Querey in the face with his fists. Patricia screamed at defendant, who repeatedly told her to be quiet and threatened to hit her too if she were not. Querey, who was about 5 feet 8 inches tall and weighed 150 pounds and was further handicapped by putting on his trousers, just stood there while defendant beat him until he fell to the floor. While he lay there defendant kicked him in the back of the head—which was later proved to be the cause of death. Then defendant bent down, and. while Querey was unconscious, took the wallet out of Querey's pocket,. removed four (or more) $50 bills. from the wallet, and threw the wallet between Querey's legs.

"Patricia at that point ran to the elevator, followed by defendant. He told her that he had gotten over $300. Defendant then concocted several lies for Patricia to tell, including a story that Querey had beaten her. Defendant soon became scared, hid, dyed his hair, and several days later fled with Patricia and another friend to New Orleans. In his confession to the district attorney (which was freely made after due admonitions and warnings) he admitted that he had gotten $200; that he had struck Querey and while Querey was unconscious but still living had taken his money."

As to the first contention, the defense at the state trial was that the robbery by the defendant was a post induced act following the beating; that the defendant went to the victim's room not for the purpose of robbery, but only for the pur-

pose of demanding of the victim an apology to the girl for whom the defendant had assumed an altruistic guardianship, that the beating occurred unintentionally when the victim went to the telephone to call for help; and that, only after the victim was unconscious on the floor, had the thought suddenly occurred and been acted upon to rob.

The Commonwealth of Pennsylvania within its sovereign power has defined the crimes of murder and robbery as felonies. It has also provided for punishment on conviction of either of these crimes.[2] The Supreme Court of Pennsylvania has passed on the question here raised and similar questions on numerous occasions. In Commonwealth v. Stelma, 327 Pa. 317, at page 321, 192 A. 906, at page 908 (1937), faced with a case similar to this one stated:

> "The defendant's argument that the intention to rob originated subsequent to the assault upon the deceased need not be seriously considered in view of the verdict of the jury. Moreover, even though such were the case, it is immaterial when the design to rob was conceived, if the homicide occurred while defendant was perpetrating or attempting to perpetrate a robbery. Where the killing occurs in the perpetration of any of the crimes specifically named in the statute referred to, the intent to kill is immaterial."

Preservation of the public peace and good order is a sovereign power in a state. Amer.Juris., Const. Law, Section 245 et sequi. No federal question exists where judicial determination is made by a state within its sovereign jurisdiction and not in violation of the Federal Constitution. Home Tel. & Tel. Co. v. Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913). Although it cannot be used to justify a violation of constitutional rights. Duckworth v. James, 4 C.A., 1959, 267 F. 2d 224. In the instant case the evidence is overwhelmingly convincing that the defendant went to the victim's room for the purpose of getting money from the victim. The appellant's contention raises only a question of fact which was properly determined at the trial of the case. No lack of due process appears in this connection. Commonwealth v. Hart, supra.

As to the second contention, did the defendant at the trial have adequate representation of counsel? The petitioner complains that the court-appointed counsel failed to consult with him, failed to obtain a material witness which the petitioner had requested him to do, and failed to prepare the petitioner's defenses.

The record discloses that the defendant before the trial had made requests for several named attorneys who refused or failed to represent him for one reason or another. Finally he asked for, and the judge allowed him the services of Attorney Armin H. Friedman.

Approximately a month later, the case was called for trial. On the morning of that day, it was reported to the assignment room judge that the defendant had become dissatisfied with his attorney and desired another one (H. David Rothman) then present in court. At page 4 of the transcript of the testimony this appears of record:

> "The Court: Mr. Hart do you agree that you did ask for the appointment of Mr. Friedman?
>
> "The defendant: Yes, I did.
>
> "The Court: You asked Judge Brown to appoint Mr. Friedman?
>
> "The defendant: Yes, I did, but since I realize he didn't have my interest at heart, Mr. Friedman wanted me to plead guilty to second degree murder. I don't believe I am guilty, and he has made no preparation for the case.
>
> "The Court: Mr. Hart how did you happen to select Mr. Friedman?

---

2. Act of June 24, 1939, P.L. 872, §§ 701–704, 18 P.S. §§ 4701–4704.

"The defendant: I had heard of his reputation as a competent attorney. I see I was mis-informed.

"The Court: You had heard about him.

"The defendant: Yes, I did.

"The Court: He didn't seek your employment?

"The defendant: No he didn't. And in view of the fact that Mr. Friedman and I are arguing, I didn't think he would have my interest at heart for certain now."

The record shows that there had been no understanding between Mr. Friedman and the District Attorney's office. It shows that Mr. Friedman had seen his client regularly, in fact, as he stated "every single day". The record also contains the comment by the court "[I]t is an attorney's duty if he sees a thing a certain way to present his point of view to you, and if you reject it, he will proceed with all the diligence and competence at his command. Usually to do his best regardless of that fact * * * ".

The judge then questioned the defendant further at page 10 of the transcript of testimony:

"The Court: Mr. Hart how did you happen to wire to Mr. Rothman?

"The defendant: Well, I heard through friends and relatives that Mr. Rothman was a competent attorney also. So * * * ".

At page 13 of the transcript this was stated:

"Mr. Rothman: I understand that your Honor, frankly that is not my primary concern right now. I think if in the course of this trial it is obvious that facts become apparent that could have been discovered on investigation, and this man's rights are being seriously denied by not having preparation in this case, and the Supreme Court might see fit to try it all over again."

On page 14, Mr. Friedman stated that he saw Mr. Rothman in the Allegheny County Jail and that at that time Mr. Rothman asked Mr. Friedman if he had any objection if he sat behind him and was an investigator in the case. Mr. Friedman answered "None". And there was no objection by the prisoner.

The judge eventually on the morning of the trial then appointed Mr. Rothman as the investigator to aid Mr. Friedman and to sit with him. He also ordered the case to proceed to trial, refusing Mr. Rothman's motion to continue the case for the allowance of additional investigation. Objection was recorded by Mr. Rothman (Tr. p. 21) that the refusal to grant the defendant counsel of his own choosing was in violation of the state statute authorizing the appointment of counsel and was also in violation of the defendant's rights under the Fourteenth Amendment.

During the course of the trial Mr. Rothman persisted in participating also as an attorney in the case. Eventually, the trial judge conferred with the other judges of the court, and it was agreed that Mr. Rothman be allowed to act as co-counsel, but that cross-examination be conducted by only one or other of the attorneys. So it was that this defendant had two lawyers representing him at the trial of this case.

The contention, here raised by the petitioner and his second trial attorney Rothman, of inadequate counsel representation appears based upon the failure of Attorney Friedman to produce a certain named witness. During the trial the defense intimated that a person named Stead had been in Patricia's company after Hart and she had been in Querey's room; that Stead and Patricia had then gone to Querey's room and taken money; and that Stead might have then killed Querey.

From all of the evidence in the case, it appears that this intimation as thrown into the record is or was done not so

much as a defense, but for the purpose of casting doubt upon the Commonwealth's case. There is no evidence that anyone saw or heard of Stead and the Kister woman having been at the scene of the crime, after Hart's presence and action there, as opposed to the Commonwealth's convincing evidence of Hart's and Patricia's presence there. This lightly inferential evidence is not helped or supported in any way by Hart's attorney, Rothman.

The case was called for trial on March 28, 1960. It was eventually argued on appeal before the Pennsylvania Supreme Court on March 15, 1961. Nothing is shown about the needed investigation and particularly as regards the witness Stead. It is obvious that Attorney Rothman had considerable time and opportunity to follow through on this if it had any meaning or importance. If it did, he could have lent aid to that meaning or importance by petitioning for a writ of coram nobis in the Pennsylvania courts under the provisions of this ancient common law remedy. Neither was anything done by Mr. Rothman in this respect up to the present time, and it was not because Stead was unavailable. From inquiry into the federal records, I have, to satisfy my own curiosity, ascertained that Stead was between March 28, 1960 and August 6, 1963 in the following places: in Pittsburgh, Pennsylvania from March 28, 1960 until June 16, 1960; in Las Vegas, Nevada at 342 Chicago Avenue and taken into Federal custody on June 16, 1960, returned to Pittsburgh and released on bond in July 1960. He resided then at 315 Cavitt Avenue, Trafford, Allegheny County, Pennsylvania. On October 20, 1960, he was sentenced to three years in jail, and in 1963 he was released on parole and lived at the YMCA in Pittsburgh. After that, he moved to Las Vegas, Nevada under custody of Nevada probation officials.

Attorney Rothman had much more time and opportunities than Attorney Friedman to investigate Stead's possible connection with any of the circumstances of the case. He either did so and found no truth to the intimation, or did not do so because it presented no value. In any event this is no longer pressed as the basis for Attorney Friedman's incompetence.

◼ Accordingly, there is no merit in the contention that Attorney Friedman did not investigate the case or that he failed to procure Stead as a necessary witness. It will also be remembered that the statement procured by the Prosecuting Attorney from Stead was read into evidence on motion of defense counsel and made a part of the record. This contention does not help the defendant. Nothing indicates that Stead could have not been made available by petitioner's counsel, or that if made available would have been of any help to the petitioner.

As for the competence of counsel, Hart had two lawyers who represented his interests as fully as could have been expected under all of the circumstances of the case. Attorney Rothman, a competent attorney, expended much energy with Attorney Friedman. Attorney Friedman is a well-known lawyer with practice before the Allegheny County criminal courts and its other courts, as well. He has a great many years of experience in back of him. I can find nothing to support Hart's contention of inadequate or incompetent legal representation at the trial of his case.

◼ The final contention of the petitioner is that he was deceitfully induced to make a confession by the Prosecuting Attorney; that his confession was used against him, and that the jury was prejudiced thereby. If, in fact, any questioning by the Prosecuting Attorney produced a confession which was not the product of the defendant's free intellect, it would not be admissible in evidence as such. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Reck v. Pate, 367 U.S. 433, 440, 81 S. Ct. 1541, 6 L.Ed.2d 948 (1961). A coerced confession is barred whether obtained by physical or mental pressure. Leyra v. Denno, 347 U.S. 556, 74 S.Ct.

716, 98 L.Ed. 948 (1954); United States ex rel. Smith v. State of New Jersey, C.A. 3, 1963, 323 F.2d 146. A statement to be voluntary however, need not necessarily be volunteered. Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

The petitioner charges deception when (page 4 of the petition) the Assistant District Attorney "assured petitioner that he did not believe petitioner deliberately set out to kill Mr. William Clark Querey", and when (page 2 of the petition) "prosecutor refrained from advising the petitioner of the Felony-Murder Rule".

■ The interview (which embodies what the petitioner asserts is the confession) was not used in the Commonwealth's case in chief. It was used by the Prosecuting Attorney after the defendant had testified in his own defense, in cross-examination for the purpose of impeaching or controverting the defendant's direct testimony. Of course, if the statement as a confession had been unlawfully obtained from the defendant, it could not be so used. Townsend v. Sain, supra.

If the defendant had not testified in his own defense, the statement would not have been used to contradict him, and yet defendant's both counsel evidently did not believe that this cross-examination relating to the interview was objectionable, for at no time during the cross-examination was any objection to the questions made. In fact Mr. Friedman made an objection only when the trial judge maneuvered him into making one, not the substance of the question but to the fact that only a part of what Mr. Hart was supposed to have said was read.[3]

From there on the transcript of the trial proceedings shows questions by the Prosecuting Attorney in cross-examination using the interview as his basis. At page 470,[4] Rothman objected to questions regarding the interview. At page 471, Friedman objected to questions relating to the jail and not relating to the interview. At page 484, after the defense rested, Rothman made a request for a directed verdict of acquittal insofar as the count in the indictment charged a felony murder, which the trial judge ruled was premature.

At page 490, Friedman objected to the admission of the *tape recording* because it was taken without knowledge of the defendant. At page 492, Rothman objected on the grounds that the tape recording had no identification, and Friedman objected on the grounds that "this would be in the form of entrapment". At page 493, Rothman then raised the defense that *the admission of the tape recording* "violates his privilege of self incrimination under the State Constitution, under the Fourteenth Amendment to the Federal Constitution".

At page 496, Rothman wanted to know why he could not hear the tape recording before it was played to the jury. At page 499, defense counsel was given the transcribed statement to read, and after it was read, at page 500, Rothman raised for the first time an objection in the following words:

" * * * when Mr. Strauss began questioning the Defendant he indicated to the Defendant that he did not believe that the Defendant had intended to kill the victim, but he did not advise the Defendant that in a murder situation intention had no bearing whatsoever on the case. And on the basis of this misrepresentation to the Defendant a statement was made. I think it indicates, if not deception, it indicates misleading the Defendant, and, therefore the statement is not a voluntary one and he was denied his privilege against self-incrimination and violates due process under the 14th Amendment."

At page 498, the trial judge *refused admission of the tape recording in evi-*

---

3. Tr. pgs. 414–415.

4. Page references from here on transcript of testimony pages.

*dence,* and at page 499 allowed Rothman the right to read portions of the typed statement: "which will explain or contradict what Mr. Strauss asked, the question Mr. Strauss put and the answer made, we will allow you to introduce that part of the statement". To this Mr. Rothman agreed.

At the completion of the case, Mr. Rothman moved for a directed verdict of acquittal as to Count 1 of the indictment charging a felony murder because of the lack of showing of intent. The trial judge at page 542 informed the jury that "Mr. Strauss said he agreed with that, that he didn't think he intended to kill this man, that is Mr. Querey".

Examining the record as to the typed statement and the alleged involuntary confession, we find that the interview was brought about in this way. A day or two after the defendant had been returned by the police from his flight to New Orleans and committed to the Allegheny County Jail, he was brought to the Homicide Division office and interviewed by the Assistant District Attorney who eventually acted as the Prosecuting Attorney. While the defendant indicated a disinclination during some of the time to answer the questions put to him by the Prosecuting Attorney, he, nevertheless, responded quite voluably. He admitted that he had given District Attorney Boyle his story immediately after being brought back from the south; that Mr. Boyle was an honest man and that was why he wanted to talk to him and that he had told him everything that happened. He informed the Prosecuting Attorney further that he had gone to the airport "just to see"; that he thought the girl was lying about the $50.00 for one thing and for another thing, that she had told him that Querey had given "her a real hard time" and "slapped her around"; that after he had gotten out there and Querey had threatened to call the desk, the fight started and he hit the man about four or five times, once in the face and then in the head; that Pat didn't realize what was happening, but when she did finally realize it, she told him to stop and practically pulled him away and that she had started to cry; that he did not believe that he was guilty of murder, and that he had not intended to kill the man, nor had he intended to rob or hurt him.

It is in this last connection that the petitioner says that he has been prejudiced by the manner in which he was questioned and by the indication to him that the Prosecuting Attorney did not believe that the defendant had intended to kill the victim, but that, nevertheless, "he did not advise the defendant that in a murder situation intention had no bearing whatsoever in the case."

Counsel for the petitioner argued that if it was not deception, it indicated a misleading of the defendant, and therefore, the statement was not a voluntary one, and its admission into evidence denied his privilege against self-incrimination and violated the due process provision of the Fourteenth Amendment.

A pertinent part of the conversation between the defendant and the Prosecuting Attorney, as read into evidence, starts at transcript of testimony, page 511:

"Answer: I don't believe I'm guilty of murder. I don't believe that in no way at all.

"Question: Well, do you mean by that you didn't intend to kill the man?

"Answer: That's right. I had no intention.

"Question: Let me say this to you, I don't think that you deliberately set out to kill the man myself.

"Answer: Well, that's murder when you deliberately set out.

"Question: Yes, that is correct. But you do admit that the fella died as a result of the beating or the blows you struck. Isn't that true?

"Answer: That's what they say, he died of the blows.

476

"Question: Well I mean, you did strike him?

"Answer: Yes.

"Question: I mean, it is unfortunate. I mean, I'll tell you quite frankly that when you say you didn't mean to kill him, I believe you. .

"Answer: I know.

"Question: I believe you but—I mean, the law is set up—I mean, your purpose was to even the score because of the girl. Isn't that right?

"By the Court:

"Question: See, I didn't hear you. The law is what?

"Answer: The law is set up—then there is an omission—I mean your purpose was to even the score because of the girl? Isn't that right?

"Answer: I wasn't trying to even any score.

"Question: Well didn't you—didn't you—you took some of the money from him, and you placed the wallet between his legs. Isn't that what happened?

"Answer: I'm not going to say."

The further argument is that during the interview the petitioner had asked for counsel, but none was forthcoming; that he wanted no recording made of the conversation and had even requested that a certain small case be removed from the room, but that, nevertheless, a recording was made without his knowledge; and that all of this amounted to the procurement of coercive statements or admission or confessions from the defendant, as the case may have been.

 The right of the police to question or interrogate one held in custody and suspected of a crime may not be thwarted. And this is even so where the person has the right to communicate with or have counsel present during the interrogation. Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958). Interrogation of a suspect

held incommunicado by the police which results in a confession does not necessarily in and of itself constitute a denial of due process. Crooker v. California, supra. The Constitution does not always require that the interests of the police in quickly and efficiently solving crimes yield to the needs of a suspect to have consultation made available to him during a period of questioning. Cicenia v. Lagay, 357 U.S. 504, 509, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958).

In Crooker v. California, supra, 357 U.S. at page 438, 78 S.Ct. at page 12, Mr. Justice Clark said:

" * * * we have held that confessions made by indigent defendants prior to state appointment of counsel are not thereby rendered involuntary, even in prosecutions where conviction without counsel would violate due process under the Fourteenth Amendment. Brown v. Allen, 1953, 344 U.S. 443, 474–476, 73 S.Ct. 397, 416–417, 97 L.Ed. 469; Stroble v. State of California, 1952, 343 U.S. 181, 196–198, 72 S.Ct. 599, 606–607 [96 L.Ed. 872]; Gallegos v. State of Nebraska, 1951, 342 U. S. 55, 64–68, 72 S.Ct. 141, 147–149, 96 L.Ed. 86."

It would seem, however, that coercion may result from state denial of a specific request for opportunity to engage counsel as distinguished from state failure to appoint counsel immediately upon arrest. Crooker v. California supra. It is only where some manifested prejudice has been produced or so induced as to interfere or obstruct the ability, power or will of the person under the circumstances which prevent him from resisting the pressure to which he is put as to require a compulsive surrender or yielding. Townsend v. Sain, supra.

The question to be decided in each case is whether a defendant's will was overborne at the time he confessed. Reck v. Pate, supra. There is no indication here of physical or psychological pressure or coercion on the part of the prosecution against Hart, nor is it contended that there was any. It is argued

only that the method of questioning by the Prosecuting Attorney, though not actual deception, amounted to entrapment. We understand that by entrapment here is not meant enticement into the committing of the crime, but rather inducement into participating in the conversation with the Prosecuting Attorney. With this I cannot agree. The petitioner uses these terms "deception" and "entrapment" as synonyms to convey the meaning of trickery as the bait by which the Prosecuting Attorney ensnared the defendant into making involuntary statements. But it is difficult to extract from this episode any wrongful action prohibited by federal law.

The defendant was neither deluded nor lulled into any sense of compulsion or over-persuasion which caused him to lose full awareness of the circumstances or apprehension for his predicament. He evidenced, throughout, knowledge of the accusation of robbery and murder resulting from a beating. It would seem that his sense of, or apprehension for his dangerous predicament caused him to want to tell his story to the District Attorney as soon as he got back to this County; and when a day or two later, the Prosecuting Attorney engaged him in conversation, he was still hoping for some measure of understanding from him, except that a day or two later, when talking to the Prosecuting Attorney he had acquired more awareness for the seriousness of this situation. This showed a partial unwillingness to engage the Prosecuting Attorney in conversation as against the open manner in which he had engaged the District Attorney. He knew that he was not compelled to answer the Prosecuting Attorney's questions because he so stated, but he, nevertheless, did and to the extent only as he desired.

He was hampered neither by delusion or ignorance. Nor did his attorneys, or either of them, subsequently at the trial, think otherwise when they failed to raise the slightest objection while the defendant was being cross-examined in connection with this conversation.

There is no merit either in the argument of this petitioner that the conversation occurred without benefit of an attorney's presence. While Hart stated during the conversation with the Prosecuting Attorney that he desired counsel, it was only at the end of the conversation that he asked for a specific attorney. At that time a telephone call was made to the Attorney and Hart was instructed not to say anything.

In conversation with the Prosecuting Attorney, in substance he said nothing more than he had told the District Attorney a day or two previous. In fact, it was less than that he had divulged to the District Attorney; so that even if he had had an attorney in the beginning, at the most the attorney would have said or advised him was not to talk. He had already waived his right to an attorney when he talked voluntarily a day or two before with the District Attorney.

If any prejudice resulted by the second conversation with the District Attorney, it could be in the sense of corroboration by a possible "secondary confession". It is difficult to see how the substance of this secondary confession could have prejudiced the then defendant's rights at his trial, just as it is difficult to understand why there was any need at all of this secondary confession.

The Commonwealth had carefully prepared and had knit together a solidly basic case for the prosecution of Hart. All the circumstances from a considerable time before the murder until after the defendant was brought back to Pittsburgh were set out and supported by testimony of witnesses in every detail and fitted logically and convincingly. If any confession was needed at all, it was contained in the oral statement voluntarily and unquestionably already given by the defendant to the District Attorney.

In substance, the oral confession to District Attorney Boyle was to the effect that he knew about Patricia having

met Querey at the Naples restaurant; that she had gone out to the airport hotel with him for approximately three hours; that when she came back, she told Hart that she had only received $50.00; that Hart decided that he would go back, because the fellow owed him more money since $50.00 represented only one hour; that Hart went out there with no intention of killing Querey; that when he got to Querey's room, Hart forced his way in; that Querey started for the telephone and threatened to call the desk or the police; that in order to prevent the incident coming to the attention of anyone, he struck Querey three or four times on the jaw and on the head; that as a result of these blows, Querey fell to the floor; that while Querey was lying there unconscious, Hart reached in his pocket and got his wallet and took out four $50.00 bills, all that was there, but which was owed to him for the extra time that the victim had kept Patricia beyond the agreed time; that Hart placed the wallet back on the floor and left with Patricia; that when Hart got back to the Naples restaurant, he became alarmed because, perhaps, he had beaten the man more severely than he had intended when he went into the room; that after a round of trips he got a man by the name of Miller to drive him and Patricia to Cleveland, but Hart changed his mind and decided to go south; that they ultimately got to New Orleans a day or two later and Hart and Patricia were arrested by the New Orleans police and the F.B.I. agents and returned to Pittsburgh.

The District Attorney testified at the trial of the case (Tr. p. 342) that he had received word that Hart had wanted to talk to him; that he first met Hart at the airport when the plane arrived and that he accompanied him and Pat Kister from the airport to the Mt. Lebanon police station; that it was then close to midnight when Hart told the District Attorney that he wanted to talk to him alone.

The District Attorney testified in part as follows:

"And I told him then that he had a long trip and that he was entitled to counsel. That he certainly must know that he had been placed under arrest on a charge of murder and that he didn't have to say anything to me or to anybody else, and that in order that he might have an opportunity to thoroughly think over the decision which he was to make, that he should not say anything to me that night, but that I would come back to the Mt. Lebanon police station the next day as early as possible. At that time he could make up his mind whether or not he wanted to talk to me about his problem."

The District Attorney said that he went back the next day and at that time he again talked with Hart. The District Attorney's testimony continues at page 343: [5]

"And he again expressed a desire to tell me and to me, alone, what was on his mind with respect to the happenings that took place at the airport on the 4th and 5th of September of that same year. So as the result of that we went into the courtroom, what is called the courtroom of the Mt. Lebanon police station and I again told John that he was under no obligation or compulsion or requirement at all to tell me anything about it. I told him 'you know that you are charged with murder and that anything you say could possibly be held against you and may possibly be a part of a subsequent trial'. And he said to me, 'you are the man that I want to talk to, there are certain things on my mind that I want you to know'."

At page 344, the District Attorney said: "And as a result of that I let him talk to me * * *".

5. Page references are from here on transcript of testimony pages.

At page 344, the District Attorney said Hart told him:

> " 'I want you to know that when I went out there I had no intention of killing that man. He owed me money and I merely wanted to go out there and collect the money that was rightly coming to me for the extra hours that he had kept Patricia in the hotel.' "

At page 346, the District Attorney testified:

> "He again reiterated to me. He said 'I didn't intend to kill that man. I am positive that when I left that hotel room he was still alive because I could hear him breathing loudly. And not only that he made some moves although he wasn't fully conscious.' He also told me that he didn't intend to rob him and he didn't consider that he was robbing him. That he was merely taking the money that was rightfully due him as the result of the other agreement down at the Naples restaurant as to what he would have to—Mr. Querey—would have to pay for the time he would spend with Patricia."

The District Attorney at page 348 said:

> "I merely listened to his story and what I have related here on the stand is his story, as he gave it to me without any suggestion on my part at all."

The statement so made to the District Attorney was a voluntary confession, and credible because (1) it was related by a reputable public official whose veracity was not questioned, and because (2) it was undenied by the defendant. In fact, the defendant admitted the correctness of the statement as the District Attorney had testified, but asserted at the trial that it was made to shield Pat Kister. Under these circumstances, the second conversation with Hart was totally superfluous.

What Judge Hastie, speaking for our Court of Appeals said in United States ex rel. Cassidy v. Yeager, 3 Cir. (1964), 327 F.2d 311, at page 317 is as opposite here:

> "It is difficult to understand what proper purpose the police were pursuing when they continued to interrogate Cassidy after his first statement instead of taking him without further delay before a magistrate for a preliminary judicial hearing. In the absence of explanation, the natural inference is that the police, not satisfied with the strong evidence which had already been elicited, were determined to press the prisoner until his account of the crime under investigation should become impressively elaborate. Such determination has marked many cases in which the Supreme Court has upset state convictions obtained through the use of confessions, for it evinces the kind of coercive atmosphere in which otherwise constitutionally innocuous improprieties may assume a threatening quality. See Haynes v. Washington, supra [373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513]; Gallegos v. Colorado, 1962, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325; Malinski v. New York, 1945, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; cf. Spano v. New York, supra, 360 U.S. at 323–324, 79 S.Ct. at 1207 [3 L.Ed.2d 1265]. It is our duty to scrutinize the circumstances pertaining to the second and third confessions closely."

Here, too, the prosecution must have known that it had a strong case against Hart. What purpose could this secondary conversation serve? But even assuming that the secondary confession might serve some purpose, it certainly did not require removing a requested presumed microphone and another microphone for recording the conversations. For repeating the words of Judge Hastie, "it evinces the kind of coercive atmosphere in which otherwise constitutionally innocuous improprieties may assume a threatening quality."

From the testimony of the District Attorney, Hart and others, it is obvious that Hart was cognizant of his predicament; that he had fled to New Orleans because of the occurrence; that he could not use his right name in Louisiana because he knew they were looking for John Hart; that the paper said were looking for him and Pat Kister for robbery-murder and suspected them of going to Mexico, or looking to go to Mexico; that if arrested, he and the girl were to state that Querey had beaten or roughed her up; that they would both have the same lawyer; that when he was arrested in New Orleans, he was informed by the police and the F.B.I. that he was being arrested on the charge of murder at Pittsburgh; that he was forcibly being returned from Louisiana to Pennsylvania because of the murder charge; and that there was the impending charge of murder awaiting him upon his return to Allegheny County. In spite of counsel's argument that the Prosecuting Attorney should have advised Hart of the Felony-Murder Rule during his interview with him, it is evident that he was already apprehensive of his position and its seriousness, and he was not deceived by the Prosecuting Attorney.

I have considered the admitted activity of removing a presumed microphone and concealing another during the interview with Hart from every angle and have examined it in the light of its possible prejudicial atmosphere and find that while it comes dangerously close to constitutional infringement under the due process clause of our Constitution, I must conclude that it is saved from infringement only because, by his voluntary confession to the District Attorney, Hart said much more factually what he said then than what he said in the second statement. The damage (if such a word is here appropriate) to Hart came not from the recorded tape (for it was not admitted) nor from the typed statement (for only a part of that was read into evidence and some of it by the defense), but from the confession made to the District Attorney corroborating as it did a solidly built case against him.

Counsel for the defendant at the trial of the case admitted that the Prosecuting Attorney could testify in defense as to the statements made by the defendant with him. Under the circumstances then, there is no merit in the argument of counsel for the petitioner on the admission of the verbal extracts of the transcription taken from the tape recording.

The petition for a Writ of Habeas Corpus will be denied.