STATE OF NEW JERSEY, RESPONDENT, v. SYLVESTER
JOHNSON AND STANLEY CASSIDY, APPELLANTS.

Argued November 16, 1964—Decided January 19, 1965.

574

*Mr. M. Gene Haeberle* argued the cause for appellants (*Messrs. Curtis R. Reitz and Stanford Shmukler*, both of the Pennsylvania Bar, and *Mr. M. Gene Haeberle*, on the brief).

*Mr. Norman Heine*, Camden County Prosecutor, argued the cause for respondent.

The opinion of the court was delivered by

PROCTOR, J. The defendants, Sylvester Johnson and Stanley Cassidy, together with Wayne Godfrey, were tried in January 1959 for felony murder. The jury found them guilty of murder in the first degree without recommendation of life imprisonment, and the court sentenced them to death. This court affirmed the convictions, *State v. Johnson*, 31 *N. J.* 489 (1960), and a number of post-conviction applications followed.[1]

---

[1] This is the fifth application of the defendants Sylvester Johnson and Stanley Cassidy for post-conviction relief which has been considered by this court. *State v. Johnson*, 63 *N. J. Super.* 16 (*Law Div.* 1960), affirmed 34 *N. J.* 212 (1961), appeal dismissed 368 *U. S.* 145,

■ This appeal by Johnson and Cassidy is from the most recent trial court denial of their application for post-conviction relief. The trial court refused the defendants' request for a full evidentiary hearing and denied them relief after hearing oral argument only. On their appeal to this court, defendants submitted affidavits in support of their grounds for relief. For the purpose of this appeal, we will consider the affidavits as if they were offered for the trial court's consideration.

## I.

■■ At the trial the evidence against the defendants and Godfrey included their confessions given to the police shortly after they were apprehended. The affidavits submitted by the defendants on their present application allege, *inter alia*, that prior to, and at the time they confessed, they were subjected to physical and mental coercion and were held incommunicado. These allegations were not made at the trial or on their direct appeal to this court. See *State v. Johnson, supra,* 31 *N. J.,* at *p.* 502. The allegations of physical and mental coercion were raised, however, on their first motion for post-conviction relief. The trial court and this court found that the defendants' stories were unbelievable and that there was no reasonable basis to say the confessions were involuntary. *State v. Johnson,* 63 *N. J. Super.* 16, 42–43 (*Law Div.* 1960), affirmed 34 *N. J.* 212, 223, 228 (1961). These allegations and the

82 *S. Ct.* 247, 7 *L. Ed.* 2d 188, *cert.* denied 368 *U. S.* 933, 82 *S. Ct.* 370, 7 *L. Ed.* 2d 195 (1961) ; *State v. Johnson,* 71 *N. J. Super.* 506 (*Law Div.* 1962), affirmed 37 *N. J.* 19 (1962), *cert.* denied 370 *U. S.* 928, 82 *S. Ct.* 1572, 8 *L. Ed.* 2d 508 (1962) ; *State v. Johnson,* 37 *N. J.* 326 (1962) ; *Johnson v. Yeager,* 38 *N. J.* 319 (1962). See also *United States ex rel. Johnson v. Yeager,* 327 *F.* 2d 311 (3 *Cir.* 1964), *cert.* denied 377 *U. S.* 984, 84 *S. Ct.* 1890, 12 *L. Ed.* 2d 751 (1964) ; *United States ex rel. Johnson v. Yeager,* 327 *F.* 2d 320 (3 *Cir.* 1964). Additionally, prior to their trial, defendants moved, *inter alia,* for an order allowing them to inspect their confessions. As a result of our opinion in *State v. Johnson,* 28 *N. J.* 133 (1958), the defendants were granted permission to examine their confessions.

allegation that they were held incommunicado go to the issue of voluntariness. As that issue has been fully litigated and decided against the defendants, it may not be raised again. *State v. (Edgar) Smith*, 43 *N. J.* 67, 74 (1964); *R. R.* 3:10A-5. Indeed, the question of voluntariness has been fully litigated and determined against Johnson and Cassidy in the federal courts. *United States ex rel. Johnson v. Yeager*, 327 *F. 2d* 311, 316-319 (3 *Cir.* 1964), *cert.* denied 377 *U. S.* 984, 84 *S. Ct.* 1890, 12 *L. Ed. 2d* 751 (1964). Godfrey's confession, however, was held to be involuntary.[2] 327 *F. 2d*, at *pp.* 313-316, *cert.* denied, *New Jersey v. Godfrey*, 377 *U. S.* 977, 84 *S. Ct.* 1882, 12 *L. Ed. 2d* 745 (1964).

██ The affidavits further allege that during their interrogation, the defendants asked for and were denied an opportunity to consult with an attorney and were not advised of their right to remain silent.[3] These allegations were not made in any of the prior proceedings, nor in their present petitions to the trial court. The defendants made these allegations for the first time in their affidavits submitted to this court. Denial of an opportunity to consult with an attorney and failure to be advised of the right to remain silent are factors relevant to the issue of voluntariness. *State v. Grillo*, 11 *N. J.* 173, 180-181 (1952); *State v. Pierce*, 4 *N. J.* 252, 262 (1950). See *Cicenia v. LaGay*, 357 *U. S.* 504, 509, 78 *S. Ct.* 1297, 2 *L. Ed. 2d* 1523, 1528 (1958). If these allegations are made on that issue, our consideration is precluded by our prior judgment. *State v. (Edgar) Smith, supra*; *R. R.* 3:10A-5.

---

[2] On Godfrey's first application for post-conviction relief, the trial court and this court fully considered Godfrey's new story, which attempted to establish the involuntariness of his confession, and found it to be unbelievable. *State v. Johnson, supra*, 63 *N. J. Super.*, at *pp.* 42-43, affirmed 34 *N. J.*, at *pp.* 223, 228.

[3] The police interrogator informed the defendants that anything they told him must be of their own free will and could be used against them.

## II.

The defendants, relying upon *Escobedo v. Illinois*, 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed.* 2d 977 (1964), apparently contend that entirely apart from the issue of voluntariness, the alleged denial of an opportunity to consult with counsel, and the failure of the police to advise them of their right to remain silent prior to their confessions, invalidate their convictions. *Escobedo* was decided by the United States Supreme Court on June 22, 1964, which, of course, was later than their convictions and appeal, and their previous applications for post-conviction relief. That decision held inadmissible at a defendant's subsequent criminal trial a statement elicited from him by the police under the following circumstances: Escobedo was arrested and interrogated by the police concerning the murder of his brother-in-law. He made no statement and a lawyer whom he had engaged obtained his release pursuant to a writ of *habeas corpus*. Eleven days later, the police again arrested Escobedo and told him that one DiGerlando had named him as the murderer. The police took Escobedo to police headquarters where they interrogated him for a number of hours. The police denied his repeated requests to consult with his lawyer, and never advised him of his constitutional rights. During the interrogation, Escobedo's lawyer arrived at the police station, but his repeated requests to see his client were denied. The court held that in the combination of circumstances—the suspect had been taken into custody, the interrogation had turned from investigatory to accusatory, the suspect's repeated requests for an opportunity to consult with his lawyer, and his lawyer's repeated requests to consult with him had been denied, and the suspect had not been warned of his right to remain silent—the accused had been denied the assistance of counsel in violation of the Sixth Amendment as made obligatory upon the states by the Fourteenth Amendment.

Only one year before the trial of defendants' case, and six years before *Escobedo,* the United States Supreme Court, in

*Crooker v. California,* 357 *U. S.* 433, 78 *S. Ct.* 1287, 2 *L. Ed. 2d* 1448 (1958), and *Cicenia v. LaGay, supra,* 357 *U. S.* 504, 78 *S. Ct.* 1297, 2 *L. Ed. 2d* 1523 (1958), expressly rejected the contention that every accused has a constitutional right to consult with counsel during police interrogation.[4] This was the prevailing law not only at the times of defendants' trial and direct appeal, but also at the times of their previous applications for post-conviction relief. The facts in *Cicenia* are so similar to those in *Escobedo* that it would be unreasonable to conclude that *Escobedo* did not overrule *Cicenia.* Assuming that the allegations contained in defendants' affidavits are within the principle announced by *Escobedo* (an assumption which we regard as unsound), and assuming for present purposes that *Escobedo* stands for a new rule of constitutional law which does not depend on voluntariness, the question is whether that rule should be applied to the convictions of the defendants even though their trial, its affirmance on appeal, and the disposition of their previous applications for post-conviction relief antedated *Escobedo.*

The defendants, in support of their argument for retroactive application of Escobedo to their convictions, cite *Gideon v. Wainwright,* 372 *U. S.* 335, 83 *S. Ct.* 792, 9 *L. Ed. 2d* 799 (1963). *Gideon* was a federal *habeas corpus* proceeding which invalidated a state criminal conviction where the indigent defendant had been denied the right to have an attorney represent him at his trial. It held that every defendant is constitutionally entitled to the assistance of counsel at his

---

4 See also *Culombe v. Connecticut,* 367 *U. S.* 568, 589 to 591, 81 *S. Ct.* 1860, 1871 to 1873, 6 *L. Ed. 2d* 1037, 1050 to 1052 (1961), where Justice Frankfurter stated:

"[T]his Court (in cases coming here from the lower federal courts), the courts of England and of Canada, and the courts of all the States have agreed in holding permissible the receipt of confessions secured by the questioning of suspects in custody by crime-detection officials. And, in a long series of cases, this Court has held that the Fourteenth Amendment does not prohibit a State from such detention and examination of a suspect as, under all the circumstances, is found not to be coercive."

trial. Defendants contend that since *Gideon* was a right to counsel case and has generally been given retroactive effect,[5] *Escobedo*, which also turns on the right to counsel, therefore must likewise be given retroactive effect.

There are, however, several factors which distinguish *Gideon* from *Escobedo*. First, *Gideon* itself was a collateral attack while *Escobedo* was a direct appeal. Second, the opinion in *Escobedo* does not indicate whether the court intended retroactive application. Unlike the treatment of *Betts v. Brady,* 316 *U. S.* 455, 62 *S. Ct.* 1252, 86 *L. Ed.* 1595 (1942), in *Gideon,* which overruled that case, there is not the slightest intimation in *Escobedo* that either *Cicenia* or *Crooker* was an "abrupt break with its own well-considered precedents," see *Gideon, 372 U. S.,* at *p.* 344, 83 *S. Ct.,* at *p.* 796, 9 *L. Ed. 2d,* at *p.* 805; or "departed from the sound wisdom upon which the Court's holding in *Powell v. Alabama* [287 *U. S.* 45, 53 *S. Ct.* 55, 77 *L. Ed.* 158] rested," *id.,* at *p.* 345, 83 *S. Ct.,* at *p.* 797, 9 *L. Ed. 2d,* at *p.* 806; or was " 'an anachronism when handed down * * *.' " *Ibid.* Unlike *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1961), there is no language in the court's opinion in *Escobedo* which provides ammunition for arguing whether retroactive effect was intended. For discussion of the arguments on either side, see Bender, "The Retroactive Effect of An Overruling Constitutional Decision: Mapp v. Ohio," 110 *U. Pa. L. Rev.* 650, 668–73 (1962). And unlike *Griffin v. Illinois,* 351 *U. S.* 12, 76 *S. Ct.* 585, 100 *L. Ed.* 891 (1956), *Escobedo* does not contain a concurring opinion indicating that the majority intended retroactive application. See Justice Frankfurter, concurring, *id.,* at *p.* 20, 76 *S. Ct.,* at *p.* 591, 100 *L. Ed.,* at *p.* 900. Third, no subsequent adjudication by the Supreme Court nor any

---

5 See, *e. g., Doughty v. Maxwell,* 376 *U. S.* 202, 84 *S. Ct.* 702, 11 *L. Ed. 2d* 650 (1964) ; *United States ex rel. Durocher v. LaVallee,* 330 *F. 2d* 303 (2 *Cir.* 1964), *cert.* denied, *LaVallee v. Durocher,* 377 *U. S.* 998, 84 *S. Ct.* 1921, 12 *L. Ed. 2d* 1048 (1964) ; *United States ex rel. Craig v. Meyers,* 329 *F. 2d* 856 (3 *Cir.* 1964) ; *Palumbo v. New Jersey,* 334 *F. 2d* 524 (3 *Cir.* 1964). But see *Commonwealth ex rel. Craig v. Banmiller,* 410 *Pa.* 584, 189 *A. 2d* 875 (*Sup. Ct.* 1963).

other court has come to our attention which reveals whether *Escobedo* was intended to be applied retroactively. As noted above, *Gideon* has been given retroactive application in a number of cases. *Griffin* was applied retroactively in *Eskridge v. Washington State Board*, 357 *U. S.* 214, 78 *S. Ct.* 1061, 2 *L. Ed.* 2d 1269 (1958).

There is nothing in the Constitution itself which compels the automatic and general application of every new rule of law to invalidate decisions already finally rendered. See *Chicot County Drainage Dist. v. Baxter State Bank*, 308 *U. S.* 371, 374–375, 60 *S. Ct.* 317, 84 *L. Ed.* 329, 333 (1939) ; *Sisk v. Lane*, 331 *F.* 2d 235, 239 (7 *Cir.* 1964) ; *United States ex rel. Linkletter v. Walker*, 323 *F.* 2d 11, 14 (5 *Cir.* 1963) ; see also Bender, *supra*, 110 *U. Pa. L. Rev.*, at *p.* 671 (1962) ; Note, "Prospective Overruling and Retroactive Application in the Federal Courts," 71 *Yale L. J.* 907 (1962) ; Note, "Collateral Attack of Pre-Mapp v. Ohio Convictions Based on Illegally Obtained Evidence in State Courts," 16 *Rutgers L. Rev.* 587, 588–91 (1962).

Perhaps, years ago, there was a philosophical compulsion to apply a new ruling retrospectively. The so-called Blackstonian conception of the nature of law and judicial decision-making was that law was perpetual and immutable. Judges were thought to be the discoverers rather than the creators of the law. Thus, a given decision was merely an evidence of the law; the most recent decision being the most authoritative evidence. An overruled holding was not bad law, it was simply never the law. See Levy, "Realist Jurisprudence and Prospective Overruling," 109 *U. Pa. L. Rev.* 1, 2 (1960) ; Note, *supra*, 71 *Yale L. J.*, at *p.* 908.

Whatever the past status of the above philosophy, it has been recently characterized as a "splendid myth." *United States ex rel. Durocher v. LaVallee*, 330 *F.* 2d 303, 312 (2 *Cir.* 1964) ; see also *Gailan v. United States*, 317 *F.* 2d 494, 497 (10 *Cir.* 1963) *United States ex rel. Angelet v. Fay*, 333 *F.* 2d 12, 16 (2 *Cir.*), *cert.* granted 379 *U. S.* 815, 85 *S. Ct.* 126, 13 *L. Ed.* 2d 28 (1964) ; Levy, *supra*, 109 *U. Pa. L. Rev.*

1. See also Justice Frankfurter's concurring opinion in *Griffin v. Illinois, supra.*

 It is now recognized that judicial decision making is often creative and requires that judges, although in a strictly limited sense, "legislate." See *Cardozo, The Nature of the Judicial Process,* 124–132 (1921); Clark and Trubek, "The Creative Role of the Judge: Restraint and Freedom in the Common Law Tradition," 71 *Yale L. J.* 255, 275–76 (1961); Weintraub, "Judicial Legislation," 81 *N. J. L. J.* 545 (1958); Levy, *supra,* 109 *U. Pa. L. Rev.,* at *p.* 28. Thus, contemporary judicial decisions announcing a new rule of law are the product, not only of a re-evaluation of abstract principles of justice but also of practical considerations of current economic, social, and political realities, and the effect of the rules announced in those decisions upon current institutions. Constitutional law is no exception.[6] See, *e. g., Brown v. Board of Education of Topeka,* 347 *U. S.* 483, 74 *S. Ct.* 686, 98 *L. Ed.* 873 (1954). In determining whether to give retroactive effect to a new rule of law, a court's consideration should be correspondingly broad. As Justice Cardozo said:

"* * * I feel assured, however, that * * * [the extent of retrospective application of a new rule], wherever it shall be, will be governed, not by metaphysical conceptions of the nature of judge-made law, nor by the fetich of some implacable tenet, such as that of the division of governmental powers, but by consideration of convenience, of utility, and of the deepest sentiments of justice." *Cardozo, supra,* at *pp.* 148–9.

 Retroactive application of any new rule will cause some degree of inconvenience in the administration of justice. Society does have an interest in preventing its courts from being burdened with a flood of relitigation. See Note, *supra,* 16 *Rutgers L. Rev.,* at *p.* 592. Furthermore, retroactive application of a new rule of law undermines the authoritative na-

---

6 Indeed, it has been said that unlike ordinary law which can feasibly be corrected by legislation, constitutional decisions should be more closely attuned to the changing social order. See Bodenheimer, Book Review, 64 *Colum. L. Rev.* 1563, 1564 (1964).

ture of final judicial decisions. Society reasonably expects that when a man is convicted of a crime by a method not considered unfair according to the rules of law then in effect, that conviction will stand. Therefore, unless some countervailing considerations of "the deepest sentiments of justice" compel otherwise, a new rule of criminal law should not be applied retroactively.

While *Gideon* and *Escobedo* may both turn on the right to counsel as guaranteed by the Sixth Amendment, the effect of and justification for retroactive application in *Gideon* is fundamentally different from *Escobedo*. When *Gideon* overruled *Betts v. Brady*, only a few states still denied counsel to the accused in a trial in a non-capital criminal case. See Israel, "Gideon v. Wainwright: The 'Art' of Overruling," *The Supreme Court Review*, 211, 267 (1963). But at the time *Escobedo* was decided, almost all the states permitted the introduction of voluntary confessions given, in the absence of counsel, during police investigation. Therefore, if *Escobedo* should be held to mean that the suspect must be furnished counsel during police investigation unless he affirmatively waives his right to counsel, then it is probable that the retroactive application of *Escobedo* would invalidate far more convictions throughout the country than *Gideon*.

But turning to our "deepest sentiments of justice," in Justice Cardozo's phrase, there is a factor of paramount significance which distinguishes the retroactive effect of *Gideon* from *Escobedo*. Where a defendant in a criminal trial was denied the assistance of counsel, abiding doubts arise as to whether the judicial procedure accurately ascertained the real culprit, see *Lewis, Gideon's Trumpet* (1964); whether the act done constituted the crime charged, see *United States ex rel. Durocher v. LaVallee, supra*, 330 *F. 2d*, at *p.* 308, or whether the act done was a crime at all, see *Carnley v. Cochran*, 369 *U. S.* 506, 508–510, 82 *S. Ct.* 884, 8 *L. Ed. 2d* 70, 73–74 (1962). In short, Gideon expresses judicial realization that denial of counsel during judicial proceedings has the clear capacity to result in the conviction of a guiltless man:

" 'Without it [the assistance of counsel], though. he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.' " *Gideon, supra,* 372 *U. S.,* at *p.* 345, 83 *S. Ct.,* at *p.* 797, 9 *L. Ed.* 2d, at *pp.* 805–806.

*Gideon* thus challenges the reliability of the judicial determination of guilt.[7] *Griffin v. Illinois, supra,* similarly challenges the reliability of the guilt-determining process. There it was held to be a violation of the Fourteenth Amendment to deny a defendant appellate review solely on account of his inability to pay for a transcript.

Where the reliability of the guilt-determining process is seriously impugned, there is good reason for applying the new rule to a case already decided. It would offend our sense of justice to continue to incarcerate a convicted man where subsequent considerations cast grave doubts upon the reliability of the determination of his guilt. But where the conviction was obtained as a result of a procedure not considered fundamentally unfair at that time,[8] and subsequent judicial decisions cast no substantial doubts upon the reliability of the determination already made, no compelling reason exists for disturbing a decision no longer subject to direct appeal.

At the time of the defendants' trial, voluntariness of a confession was the criterion for its admission in evidence. See *Grillo, supra,* and *Pierce, supra.* Further, to fortify the reliability of a voluntary confession, independent corroborative evidence was required to sustain a conviction. *State v. Lucas,* 30 *N. J.* 37, 56 (1959) ; *State v. Johnson, supra,* 31 *N. J.,* at *p.* 502. These two requirements still assure that the issue of guilt was reliably determined.

---

[7] In *State v. (James) Smith,* 37 *N. J.* 481, 484 (1962) Chief Justice Weintraub referred to the same thought as the "truth of the conviction."

[8] Thus, cases such as *Com. of Pennsylvania ex rel. Herman v. Claudy,* 350 *U. S.* 116, 76 *S. Ct.* 223, 100 *L. Ed.* 126 (1956), are distinguishable. There the petitioner for post-conviction relief alleged facts, never before raised in a judicial proceeding, which would have entitled him to relief under the due process standards existing at the time of his conviction if raised at that time.

The case before us amply illustrates the point: On January 24, 1958, Edward Davis, while conducting business in his toy store in Camden, was shot four times resulting in his death. Witnesses identified Godfrey's automobile leaving the vicinity of the crime and shortly thereafter the defendants and Godfrey were apprehended by the police. The defendants and Godfrey all confessed that they had planned to rob Davis' store; that they had borrowed guns for Johnson and Cassidy to use in the holdup; and that Godfrey drove his automobile and waited near the store while Johnson and Cassidy went in to rob Davis. Johnson and Cassidy confessed that when they attempted to hold up Davis, Davis tussled with Johnson and Johnson fired at him a number of times, and that Johnson's finger was cut. They then fled the store, and rejoined Godfrey, who drove them home. The defendants' confessions were not given in the presence of each other yet were essentially identical.

At the trial these confessions were introduced into evidence. At the request of the defendants and Godfrey, the hearing on the voluntariness of the confessions was conducted by the trial judge out of the presence of the jury. The State produced evidence to show that the confessions were voluntarily given. The defendants did not take the stand. Nor did they offer any other evidence in rebuttal. After the trial court found that the confessions were voluntary and therefore admissible, the prosecutor expressed his intention to produce the same evidence of voluntariness for the jury's consideration.[9] But defendants informed the court that the confessions could be read to the jury without any testimony on the issue

---

[9] Under the New Jersey procedure for the admission in evidence of a confession, the trial judge must first determine whether the confession was voluntary. If he finds the confession to be voluntary, and hence admissible, he instructs the jury to also consider the voluntariness of the confession and to disregard it unless the State proves it was voluntarily given. *State v. LaPierre*, 39 *N. J.* 156, 162–163 (1963). This procedure conforms to the constitutional requirements of *Jackson v. Denno*, 378 *U. S.* 368, 84 *S. Ct.* 1774, 12 *L. Ed. 2d* 908 (1964).

of voluntariness since they were "satisfied not to go through it again."

The confessions were read to the jury. The State also introduced evidence which corroborated many of the details contained in the defendants' confessions. See *State v. Johnson, supra,* 31 *N. J.,* at *pp.* 494–501. Included in the State's evidence were the guns used by Johnson and Cassidy. The State proved that the gun Johnson confessed to using had in fact fired the fatal shots. Further, a witness testified that Johnson told him on the day following the shooting that he had hurt his finger tussling with the proprietor of the toy store. In his summation, Johnson's counsel told the jury that Johnson had had no opportunity to learn what his codefendants had confessed to and that his confession was "truthful and honest." Cassidy's counsel, in his summation, told the jury that the confessions made by Cassidy were true, as he and Cassidy had been over them "many, many times." Both counsel conceded their clients' guilt but pleaded with the jury not to impose the death penalty.

Unlike *Gideon,* the rule of law which the defendants contend *Escobedo* announces does not raise substantial doubt as to the reliability of the determination of guilt.[10] Therefore, we will not apply that rule to the prior convictions of Johnson and Cassidy.

The purpose of a rule calculated to prevent police interrogation, without the presence of counsel, of a suspect accused of a crime is more akin to the rule of *Mapp v. Ohio* than to the *Gideon* rule. The *Mapp* rule prohibits the introduction of evidence seized in violation of the Fourth Amendment. Most authorities recognize that the purpose of the *Mapp* rule is the deterrence of illegal police conduct. See, *e. g.,* Traynor, "Mapp v. Ohio at Large in the Fifty States," 1962 *Duke L. J.* 319 (1962); Bender, *supra,* 110 *U. Pa. L. Rev.,* at *p.* 660.

---

[10] This distinction has been recognized by Judge Irving R. Kaufman of the Second Circuit Court of Appeals in a recent article. "The Uncertain Criminal Law," *The Atlantic,* January, 1965, *pp.* 61, 62–64.

We, like the courts in most jurisdictions, have held that *Mapp* does not apply retroactively in a collateral attack upon a prior judgment no longer subject to direct appeal. See *State v. (Edgar) Smith, supra,* and the cases cited therein, at *pp.* 78–79 of 43 *N. J.* The rationale of these decisions, which is supported by the commentators, is that the purpose of the *Mapp* rule is deterrence, and it is impossible to deter past conduct. See, *e. g., United States ex rel. Angelet v. Fay,* 333 *F. 2d* 12, 19 (2 *Cir.* 1964). See also *Traynor, supra,* 1962 *Duke L. J.* 319.[11]

We note that *certiorari* has been granted in *United States ex rel. Angelet v. Fay, supra* (379 *U. S.* 815, 85 *S. Ct.* 126, 13 *L. Ed. 2d* 28 (1964)), and *United States ex rel. Linkletter v.*

---

[11] Justice Traynor's remarks concerning the retroactive application of the *Mapp* rule are also appropriate in relation to the retroactive application of *Escobedo*:

"The most telling reason for collateral attack on judgments of conviction is that it operates to eliminate the risk of convicting the innocent. Such a risk attends any conviction ensuing from the witting use of perjured testimony, the suppression of evidence, an involuntary confession, the denial of an opportunity to present a defense, and the denial of the right to counsel. A comparable risk arises upon a failure to provide an indigent defendant with a trial transcript necessary to perfect his appeal.

The most telling distinction of a defendant convicted on evidence resulting from an unreasonable search or seizure is that he is clearly guilty. It is not the purpose of the exclusionary rule to protect the guilty. Its purpose of deterring lawless law enforcement will be amply served in any state from now on by affording defendants an orderly procedure for challenging the admissibility of the evidence at or before trial and on appeal.

Deterrence would be served but little more and at exorbitant cost by affording the weapon of collateral attack to those defendants who were convicted before the adoption of any exclusionary rule and hence had no way of challenging the admissibility of the evidence. To begin with, their cases are history, and they should not now be given the power to rewrite it. To place at the disposition of the guilty an extra-ordinary remedy designed to insure the protection of the innocent would be to invite needless disruption in the administration of justice. There is a world of difference between a timely objection to evidence on the basis of the exclusionary rule and the uprooting of final judgments." 1962 *Duke L. J.,* at *pp.* 340–41.

*Walker,* 323 *F.* 2*d* 11 (5 *Cir.* 1963) (377 *U. S'.* 930, 84 *S. Ct.* 1340, 12 *L. Ed.* 2*d* 295 (1964)). Both these cases refused to hold *Mapp* retroactive on collateral attack. Despite the similarities noted above between *Mapp* and *Escobedo,* there is a significant difference between the cases, which leads us to believe that if *Mapp* should be held retroactive, it does not follow that *Escobedo* should. *Weeks v. United States,* 232 *U. S.* 383, 34 *S. Ct.* 341, 58 *L. Ed.* 652 (1914), held that the Fourth Amendment prevented the admission in federal courts of all evidence obtained by an unreasonable search and seizure. Later, *Wolf v. Colorado,* 338 *U. S.* 25, 69 *S. Ct.* 1359, 93 *L. Ed.* 1782 (1949), held that although the state obtained its evidence unconstitutionally, the evidence was nevertheless admissible in a state trial. It is clear, therefore, that it has always been unconstitutional to conduct an unreasonable search and seizure. *Mapp* merely provided an exclusionary remedy for the violation of a pre-existing constitutional right. Therefore, it could be argued that reliance of the police on *Wolf* was not in good faith, because they were on notice that their conduct in obtaining the evidence was unconstitutional.[12] On the other hand, prior to *Escobedo,* it had generally been assumed that the police could lawfully detain and question a suspect, in the absence of his counsel, for a reasonable period of time. Since the police were not on notice that their conduct was unconstitutional, their reliance on the existing status of the law was justified.

### III.

 The defendants next contend that under *Malloy v. Hogan,* 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. Ed.* 2*d* 653 (1964), decided by the United States Supreme Court on June 15, 1964, it was constitutionally impermissible in the present case for the prosecutor and the trial court to tell the jury that they

---

[12] See the dissenting opinion of Judge Marshall in *United States ex rel. Angelet v. Fay, supra,* 333 *F.* 2*d,* at *p.* 25.

might infer from the defendants' failure to testify that the defendants could not truthfully deny the inculpatory facts produced against them. The defendants argue that the rule of *State v. Corby*, 28 *N. J.* 106 (1958), which permits such comments, has been declared unconstitutional by *Malloy*. *Malloy* held that the Fifth Amendment's privilege against self-incrimination is applicable to the states through the due process clause of the Fourteenth Amendment, and expressly overruled *Twining v. New Jersey*, 211 *U. S.* 78, 29 *S. Ct.* 14, 53 *L. Ed.* 97 (1908) and *Adamson v. California*, 332 *U. S.* 46, 67 *S. Ct.* 1672, 91 *L. Ed.* 1903 (1947), on this point. *Twining* and *Adamson* assumed but did not decide that "comment" was forbidden by the Fifth Amendment. Since 1878 a federal statute (18 *U. S. C. A.* § 3481) has prohibited comment in federal courts, therefore the constitutional issue of the permissibility of comment has never been decided by the United States Supreme Court. See *Wilson v. United States*, 149 *U. S.* 60, 13 *S. Ct.* 765, 37 *L. Ed.* 650 (1893) ; *Bruno v. United States*, 308 *U. S.* 287, 60 *S. Ct.* 198, 84 *L. Ed.* 257 (1939). The holding in *Malloy* was that a witness's right in a state proceeding to refuse to answer questions on the ground that his answers would tend to incriminate him was to be determined by federal standards. *Malloy* did not involve the issue of "comment." However, the court's opinion contains the following *dictum:*

"The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty, as held in *Twining*, for such silence." 84 *S. Ct.*, at *p.* 1493, 12 *L. Ed.* 2d, at *p.* 659.

See also *State v. Murphy*, 85 *N. J. Super.* 391 (*App. Div.* 1964).

Assuming *arguendo* that *Malloy* forbids comment by the prosecutor and the court on defendant's failure to testify, the question is whether that ruling should be applied here. When

the defendants were tried, they made no issue of their guilt. Indeed, their attorneys told the jury that the defendants were guilty of the crime with which they were charged. The sole thrust of the defense offered was to persuade the jury to recommend life imprisonment and thus spare defendants' lives. Under these circumstances the comment of the prosecutor and the trial court could not have influenced the jury in its determination of the defendants' guilt.

The defendants further contend that the prosecutor's comment about the failure of the defendants to take the stand, suggested to the jury that they should consider that failure on the issue of punishment. We considered the prosecutor's remarks in *State v. Johnson, supra,* 31 *N. J.,* at *p.* 512 and held that:

> "[I]n view of the trial court's clear instruction that the defendants' failure to testify should not be considered by the jury in their determination whether to recommend life imprisonment—the only real issue before the jury—we are satisfied that the remark did not prejudice the substantial rights of the defendants."

Therefore, we conclude that the comment of the prosecutor and the trial court could not have adversely affected defendants' rights to a fair trial as guaranteed by the due process clause of the Fourteenth Amendment. In so holding, we express no opinion as to whether *Malloy* forbids adverse comment by the prosecutor or the court on defendants' failure to testify. Nor do we express an opinion whether, if *Malloy* does forbid such comment, that rule should be applied retroactively in a collateral proceeding under circumstances other than those in this case.

### IV.

The defendant Cassidy next contends, for the first time, that his confession that he had a gun in his possession at the time of the holdup, and the introduction of the gun into evidence at the trial were the products of fraudulent

statements made by the police.[13] Further, in his affidavit he alleges that the police promised to save him from the electric chair if he confessed. Each of these allegations goes to the issue of voluntariness and could have been raised on the direct appeal or on his first application for post-conviction relief, when the issue of voluntariness was considered. See *State v. Johnson, supra,* 34 *N. J.,* at *p.* 223. This issue, having been previously determined, is foreclosed from our present consideration. *State v. (Edgar) Smith, supra; R. R.* 3:10A–5.

## V.

Defendants next contend that their confessions, even if voluntary, should have been excluded from evidence because they were obtained while the defendants were illegally detained in that they had been arrested but had not been taken without unnecessary delay before a magistrate as directed by *R. R.* 3:2–3(a). This issue was decided in our recent decision in *State v. Jackson,* 43 *N. J.* 148 (1964), which noted that the federal exclusionary rule of *McNabb-*

---

13 Cassidy attempted to obtain relief on the basis of this allegation for the first time on his appeal to the Third Circuit. That court made no determination of the point because it had not been raised in the District Court. It noted, however:

"If the Prosecutor did give the prisoner this assurance, it is arguable that the rules of evidence should exclude an admission thus obtained in exchange for a promise of favorable treatment. See *Shotwell Mfg. Co. v. United States,* 1963, 371 *U. S.* 341, 348, 83 *S. Ct.* 448, 9 *L. Ed.* 2d 357 (dictum) (federal prosecution) ; *Crawford v. United States,* 5th *Cir.* 1955, 219 *F.* 2d 207 (semble) (federal prosecution). See generally *Bram v. United States,* 1897, 168 *U. S.* 532, 18 *S. Ct.* 183, 42 *L. Ed.* 568 (federal prosecution) ; Maguire, *Evidence of Guilt,* 1959, *p.* 139. But such a bargain is an improper means of persuasion rather than a device of compulsion. It may produce a statement that is untrustworthy because a suspect may be induced to incriminate himself falsely when he is led to believe that all things considered, he will gain thereby. But bargaining for a confession is not shocking and outrageous in the way that third degree methods are. Probably for this reason, courts have not heretofore made the rule which excludes testimony induced by promise of favor a constitutional mandate." *United States ex rel. Johnson v. Yeager,* 327 *F.* 2d 311, 317 (1964).

*Mallory* (*Mallory v. United States,* 354 *U. S.* 449, 77 *S. Ct.* 1356, 1 *L. Ed. 2d* 1479 (1957); *McNabb v. United States,* 318 *U. S.* 332, 63 *S. Ct.* 608, 87 *L. Ed.* 819 (1943)), is not of constitutional dimension. There being no definitive United States Supreme Court holding to the contrary since our decision in that case, we will not depart from *Jackson.* Moreover, even if the Supreme Court should declare the *McNabb-Mallory* rule applicable to the states, since that rule is not predicated upon the issue of the unreliability of the evidence obtained during illegal detention, the rule should not be applied to the trial of this case which occurred in January 1959. See our discussion above considering the similar application of *Escobedo.*

Cassidy further contends that he was illegally arrested. If true, this factor would be pertinent to the issue of the illegality of his detention. As we have discussed immediately above, the *McNabb-Mallory rule* which excludes in federal prosecutions confessions obtained during illegal detention is not a rule of constitutional dimension and thus not applicable to our courts.

## VI.

As mentioned above, the Third Circuit has held that the confession of Godfrey was involuntary and therefore inadmissible. But the confessions of the defendants Johnson and Cassidy were found to be voluntary. *United States ex rel. Johnson v. Yeager, supra,* 327 *F. 2d* 316, 319. The defendants now argue that since Godfrey's confession has been held to have been involuntary and therefore inadmissible, the introduction of his confession, which implicated them, at the joint trial of Godfrey, Johnson and Cassidy, denied Johnson and Cassidy a fair trial. The Third Circuit considered this point. It held that the admission of Godfrey's involuntary confession did not prejudice the rights of Johnson and Cassidy:

"Finding only Godfrey's confession to have been involuntary on the record before us, we have considered whether the admission of that confession itself affected the constitutional rights of Cassidy and Johnson. The introduction of a coerced confession in evidence against one defendant is not in itself the imposition of constitutional wrong upon his co-defendant. *Stein v. New York, supra,* 346 *U. S.* [156], at 194–196, 73 *S. Ct.* [1077], at 1097–1098 [97 *L. Ed.* 1522]; *Malinski v. New York, supra,* 324 *U.S.* [401], at 410–412, 65 *S. Ct.* [781], at 786 [89 *L. Ed.* 1029]. The jury was instructed to consider each confession as evidence against its maker only. And here we have the additional consideration that substantially the same information was placed before the jury in the confessions of Cassidy and Johnson as in the confession of Godfrey. In these circumstances, we think it is not reasonable to believe that the jury would or, indeed, had any occasion to go beyond Cassidy's and Johnson's own confessions and use similar statements in Godfrey's confession against them." *Id.,* at *pp.* 318–319.

We are entirely in accord with the above views as to Johnson and Cassidy. Furthermore, while the conclusion of the Third Circuit that Godfrey's confession was involuntary alters the status of his confession as to him—it is no longer admissible on the state of the evidence before that court—the status of his confession as to Johnson and Cassidy remains unaltered since Godfrey's confession was never admissible against them.

On their direct appeal from their convictions the defendants contended that they were deprived of a fair trial by the denial of their motions for separate trials. They argued that their respective confessions inculpated the others, and the jury could not be expected to limit the effect of the statements to the declarant. We noted that the confessions of all three defendants were in substantial agreement, that none placed the onus of the crime on the others, and that the trial judge repeatedly cautioned the jury on the limited effect to be given each confession. We held that, under those circumstances, a severance was unnecessary. 31 *N. J.,* at *pp.* 505–506. In so holding we necessarily concluded that the admission of each defendant's confession did not prejudice the others in the jury's finding of guilt. The defendants, in essence, make the same argument now that was made on their direct appeal, *i. e.,* that the admission of Godfrey's confession prejudiced them. As above mentioned, we have already de-

cided this issue on defendants' direct appeal. An issue, even of constitutional dimensions, once decided, may not be relitigated. See *State v. (Edgar) Smith, supra,* 43 *N. J.,* at *p.* 74; *R. R.* 3:10A–5.

Defendants further contend that their confessions were a product of Godfrey's confession, which the Third Circuit has held to be involuntary. They argue that their confessions should have been inadmissible as the "evil fruits" of the coercion of Godfrey. In their affidavits they allege that before they confessed, the police told them that Godfrey had made a statement implicating them.

Of course, whether Godfrey's statements were voluntary or involuntary does not affect the previous findings of this court and the federal courts on the voluntariness of Johnson's and Cassidy's confessions. Assuming the truth of the defendants' affidavits and assuming further that Godfrey's statements as used by the police were a factor in causing Johnson and Cassidy to confess, we conclude that the constitutional rights of Johnson and Cassidy were not violated. This is not a case where a defendant's involuntary statement has led to other evidence which is introduced at trial against *him.* See, *e. g., Wong Sun v. United States,* 371 *U. S.* 471, 487–488, 83 *S. Ct.* 407, 9 *L. Ed. 2d* 441, 455 (1963). *Cf. Trilling v. United States,* 104 *U. S. App. D. C.* 159, 260 *F. 2d* 677, 694 (*D. C. Cir.* 1958); *Jackson v. United States,* 106 *U. S. App. D. C.* 396, 273 *F. 2d* 521 (*D. C. Cir.* 1959). Here, the alleged coercion of Godfrey's confession was in violation of his constitutional rights and would preclude its introduction in evidence against *him.* Analogous cases dealing with the introduction of illegally seized evidence against one who was not the victim of the seizure, have consistently held that that person cannot assert the denial of another's rights. See *Wong Sun v. United States, supra,* 371 *U. S.,* at *p.* 492, 83 *S. Ct.,* at *p.* 419, 9 *L. Ed. 2d,* at *p.* 458; *State v. Nobles,* 79 *N. J. Super.* 442 (*App. Div.* 1963). *Cf. Goldstein v. United States,* 316 *U. S.* 114, 62 *S. Ct.* 1000, 86 *L. Ed.* 1312 (1942). Vol-

untariness remains the test in this situation. *State v. Wade,* 40 *N. J.* 27, 35 (1963).

### VII.

The defendants finally contend that the prosecutor's summation to the jury was so inflammatory that it deprived them of due process of law. The character of the prosecutor's remarks was fully considered by this court on the defendants' direct appeal and we were completely satisfied that the defendants' right to a full and fair trial was not denied. *State v. Johnson, supra,* 31 *N. J.,* at *p.* 513. Defendants are precluded from again raising this issue. *R. R.* 3:10A–5. Nevertheless, the defendants contend that the court should reconsider because the Third Circuit (327 *F.* 2d 311) has now held Godfrey's confession to have been involuntary and therefore inadmissible. However, they offer no explanation of how this factor now makes the prosecutor's remarks so prejudicial to them as to be a denial of due process. We can see no new prejudice to the defendants from the Third Circuit's finding that Godfrey's confession was inadmissible, since the inadmissibility of Godfrey's confession does not, of course, undermine the propriety of Godfrey's being a codefendant.[14]

The judgment of the Law Division is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.

---

[14] Godfrey's confession was not the only evidence the State produced against him. For example, Godfrey told a friend that he had been in the holdup, but had not done the shooting. See *State v. Johnson, supra,* 31 *N. J.,* at *p.* 501.